## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EDGENET, INC.*et al.*,[1] | ) | Case No. 14-10066 (  ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DECLARATION OF JULIET REISING IN SUPPORT
### OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, JULIET REISING do hereby declare, under penalty of perjury, that:

1.    I am the Chief Financial Officer and Secretary of Edgenet, Inc. ("*Opco*") and Edgenet Holding Corporation ("*Holding*") together with Opco, the "*Debtors*," "*Edgenet*," or the "*Company*"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.    On January 14, 2014 (the "*Petition Date*"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Edgenet, Inc. (4977); Edgenet Holding Corporation (4146). The Debtors' main corporate address is 8 Piedmont Center, 3525 Piedmont Road, Suite 420, Atlanta, GA 30305.

3.      I submit this declaration (this "*First Day Declaration*") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "*First Day Motion*," and collectively, the "*First Day Motions*").[2] Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

A.      **Overview of the Debtors' Corporate Structure and Business**

a.      *Company Background*

5.      The Debtors are providers of cloud based content, applications and services that enable companies to sell more products and services with greater ease across multiple channels and devices. The solutions offered by the Debtors to its customers feature patented and patent pending content, guide, catalog, configuration and engineering offerings to allow customers to sell products and services on mobile, web and in-store platforms. Its solutions allow customers to address the ever increasing demand by consumers for credible shopping experiences that deliver

---

[2] All capitalized terms not otherwise described herein shall have the meanings ascribed to them in the relevant First Day Motion.

detailed information and relevant knowledge in intuitive ways to identify, research and purchase products and services.

6.      The Debtors have three business locations, Waukesha, WI, Brentwood, TN and its main office in Atlanta, GA. The Debtors currently have approximately 80 employees spread across their three business locations.

7.      In 2004, Liberty Partners Holdings 44, L.L.C. ("*Liberty Partners*") formed Holding and through a reverse triangular merger purchased all of the equity interests of EdgeNet, Inc. ("*EdgeNet*").   Subsequent to the merger, EdgeNet filed an Amended and Restated Certificate of Incorporation which, *inter alia*, changed its name to Edgenet, Inc. At the time of the transaction, in addition to the approximately $40,000,000 paid for the equity interests in EdgeNet, the equity holders of  EdgeNet (the "*Sellers*") also took back $20,000,000 in promissory notes (the "*Seller Notes*"). Edgenet pledged certain of its assets (limited to the annual licensing fees paid or payable to the Debtors pursuant to software license agreements with customers) to secure the repayment of the Seller Notes.

8.      Further, at closing on the sale, Liberty Partners Lenders, L.L.C. ("*Liberty Lenders*") provided to Edgenet a line of credit in the amount of $6,000,000 to help fund its operations and Edgenet granted to Liberty Lenders a security interest in and to substantially all of its assets.  Over the course of the next several years, as Edgenet  continued to grow both organically as well as through strategic asset acquisitions, it borrowed additional sums from Liberty Lenders, each time granting to Liberty Lenders a security interest in and to substantially all of its assets.

9.      As of the Petition Date, between principal and unpaid interest, Edgenet owed to Liberty Lenders approximately $85,000,000. The interest payment in the amount of $16,000,000

-3

due to Liberty Lenders in October, 2013 was not made. At the same time, Edgenet owed the Seller Notes approximately $18,360,000 for unpaid principal and interest.

10.        During the course of its history, Edgenet never generated funds sufficient to allow it to fully service its secured debt, causing it to repeatedly negotiate refinancings of its secured debt with Liberty Lenders.  Given its liquidity issues, in consultation with its advisors, Edgenet decided to sell its assets and in support of that action plan hired JMP Securities, LLC ("**JMP**") to conduct a sale process.  JMP began the sale process in July of 2013 and through this process, which targeted both financial as well as strategic buyers, several viable acquisition candidates emerged. As of the Petition Date, while no stalking horse bidder has been identified, the Debtors continue to be in serious discussions with possible purchasers and believe that within a short period of time they will be in a position to move forward with a sale process.

B.        **The Debtors' Capital Structure**

11.        Opco is wholly owned by Holding.

12.        Opco is the Borrower under a series of loans from Liberty Lenders. Currently due and owing by Opco to Liberty Lenders is over $85 million dollars, comprised of in excess of $53 million in principal indebtedness and approximately $32 million in accrued and unpaid interest through December 31, 2013.  While certain loans made by Liberty Lenders to Opco were repaid from additional funds borrowed from Liberty Lenders, Liberty Lender's principal debt consists of loans made to or refinanced for Opco in 2008 (approximately $22 million), 2010 (approximately $11 million) and 2011 (approximately $20 million).

13.        To secure the repayment of the loans from Liberty Lenders to Opco, Opco granted to Liberty Lenders a first priority security interest in and to substantially all of Opco's assets (inventory, equipment, goods, documents, instruments, chattel paper, letters of credit, letter-of-

-4-

credit rights, securities collateral, investment property, intellectual property, general intangibles, deposit accounts and the proceeds and products of each of the foregoing categories of collateral).

14.    In addition, at the time of the acquisition of the equity interests of EdgeNet in 2004, as set forth above, Holding executed the Seller Notes in favor of the Sellers in the principal amount of $20 million. Since 2004, all quarterly interest payments due under the Seller Notes at 8% have been paid until the quarterly payment due on December 31, 2013. Further, $2 million in principal payments were made on account of the Seller Notes. Absent default, the remaining $18 million in principal owed to the Seller Notes does not become due until September 21, 2014.

15.    In order to secure the Seller Notes, as set forth above, Opco granted to the Seller Note holders a security interest in and to the annual licensing fees on software licenses granted by Opco. At the time of the 2004 acquisition, the then Owner Representative (as defined in the security agreement executed in conjunction with the acquisition) filed on behalf of the Seller Notes a UCC-1 perfecting the security interest in and to the collateral which was granted to the Seller Notes. In 2009, the Seller Note holders failed to file a UCC-3 continuation statement, so I am informed. In October of 2013, the Owner Representative filed a new UCC-1, attempting to resurrect the security interest for the Seller Notes. As a result, I have also been informed, the security interest granted to the Seller Notes while currently perfected is subject to avoidance as a preferential transfer, thereby rendering the Seller Notes unsecured.

C.    **Events Leading to the Bankruptcy Filing**

16.    Due to insufficient liquidity, interest payments owed to its two secured lenders were not made in the late fall and early winter of 2013.

17.    The failure of Edgenet to make the aforementioned interest payments caused a default under its loan agreements with its secured lenders.

-5-

18.     Notwithstanding the defaults, Edgenet continued to move forward with the sale process in the hopes that if it found a buyer, an agreement could be reached with its secured lenders as to a distribution of the sale proceeds, allowing a sale to close, thus preserving jobs for many of the Edgenet employees and maximizing value to all creditors and parties in interest.

19.     Unfortunately, a dispute arose between the two secured lenders as to the division of the proceeds of any sale of the Debtors' assets.

20.     This dispute has threatened to derail the sale process to the detriment of all constituencies.

21.     Thus, given the real likelihood that the sale process will be stymied due to the dispute between the secured creditors and given the defaults of the Debtors under the loan agreements with their secured creditors, the Debtors were compelled to initiate these bankruptcy proceedings so they would be able to move forward with a sale of their assets despite the dispute between the secured creditors, thereby maximizing value for all creditors and parties in interest.

C.     **Proposed Sale of Substantially All Assets**

22.     The Debtors intend to pursue a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code. The Debtors have determined in consultation with their advisors that the value of the Debtors' estates is likely to be maximized through a prompt sale.

23.     While no stalking horse has yet been identified, the Debtors strongly believe in consultation with their counsel that one will be identified very shortly.

D.     **First Day Motions**

24.     I reviewed each of the First Day Motions and participated in the preparation thereof. I believe that, to the best of my knowledge, the facts set forth in the voluntary petitions and the First Day Motions are true and correct. This representation is based upon information

-6-

and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Motions.

25.     The relief sought in the First Day Motions will minimize the adverse impact of these cases on the Debtors and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to maximize recoveries to creditors in these cases.

26.     As described more fully below, the Debtors carefully tailored the relief requested in the First Day Motions in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm.

    **b.**  **Motion for Joint Administration**

27.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect both of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases. The Debtors further believe that in order to optimally and economically administer the Debtors' pending Chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Opco The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the Debtors believe that the relief requested by this motion will also simplify

-7-

supervision of the administrative aspects of these cases by the Office of the United States Trustee. For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

  **c.**  **Motion to Employ and Retain Claims, Noticing and Balloting Agent**

  28.  The Debtors request entry of an order appointing Phase Eleven Consultants, LLC ("Phase Eleven") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' cases. The Debtors' selection of Phase Eleven to act as the claims and noticing agent satisfies the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least three (3) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Phase Eleven's rates are competitive and reasonable given Phase Eleven's quality of services and expertise. The terms of retention are set forth in the Engagement Agreement annexed as Exhibit A to the Phase Eleven Application; provided, however, that Phase Eleven is seeking approval solely of the terms and provisions as set forth in the Phase Eleven Application and the proposed order attached thereto.

  29.  Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be hundreds of entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

-8-

30.    I have reviewed the Phase Eleven Application and verify that the facts set forth therein are accurate, and I believe the relief requested in the Phase Eleven Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Phase Eleven Application should be approved.

**d.    Cash Management Motion**

31.    The Debtors seek entry of an order of the Court authorizing them to: (a) continue to use their Cash Management System, (b) maintain existing business forms, and (c) schedule a final hearing on the Cash Management Motion.

32.    The Debtors further request that the Court authorize the Banks to (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date and (iii) undisputed, outstanding service charges owed to the Banks and credit card processors as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

33.    Absent authority enabling the Debtors to continue to operate their Cash Management System, the Debtors would be unable to effectively maintain their financial

-9-

PHIL1 3337841v.1

operations, which would cripple the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest.

34.    The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity.  The majority of collections go straight into a lock box maintained at Silicon Valley Bank ("***Silicon Bank***"), and then from there promptly into Silicon Bank (the "Operating Account"). At the end of each day, the funds are moved into a sweep account and then placed back into the Operating Account the next morning. Any credit card payments are processed through PayPal and are deposited directly into the Operating Account.  All payments by the Debtors are drawn from the Operating Account and many payments are made by physical check.  The Debtors also maintain an account at J. P. Morgan Chase, N.A. ("***Chase Bank***").  The account at Chase Bank is a depository bank only and funds which go into or out of this account only go into or come from the Operating Account. The Debtors do not maintain separate payroll or tax accounts, as any payments on account of these obligations are paid from the Operating Account. Payroll is wired from the Operating Account to ADP a few days in advance of each payroll and is then paid directly by ADP. Businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Granting the Debtors the authority to continue using the Cash Management System will help facilitate a smooth transition into the chapter 11 cases.

35.    In the ordinary course of business, the Debtors use numerous varieties of business forms.  To minimize expenses to their estates and avoid confusion on the part of employees,

-10-

customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors in possession, provided however, that upon depletion of the Debtors' check stock, the Debtors will obtain new check stock reflecting their status as debtors in possession. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

36.    Absent authority enabling the Debtors to continue to operate their Cash Management System, I believe the Debtors would be unable to effectively maintain their financial operations, which would cripple the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest. Additionally, I believe that if the Debtors were required to comply with the U.S. Trustee Chapter 11 Guidelines, the burden of opening new accounts, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend would disrupt the Debtors' business at this critical time. I further believe that maintaining the existing Cash Management System, including their Bank Accounts, will not harm parties in interest because the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.

37.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

-11

e.    **Employee Wages/Benefits Motion**

38.    To minimize the personal hardship that the Debtors' various employees will suffer if certain prepetition amounts are not paid when due or as expected, and to maintain the morale of an essential workforce during this critical time, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition wages, salaries, commissions, incentives, and other compensation and reimbursable employee expenses, (b) authorizing, but not directing, the Debtors to continue employee benefits programs, (c) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition employee obligations (collectively, and as described herein, the "*Employee Obligations*") and (d) scheduling a final hearing to consider entry of the Final Order.

39.    Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture. Accordingly, the Debtors seek the authority, but not the direction, to continue to honor, pay, satisfy or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations in the Employee Wage Motion.

40.    The Debtors believe any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations would cost the Debtors' estates more than the requested payments due to factors such as the cost of losing an employee's know how and the cost of replacement of some employees who would be inclined to accept other jobs.

-12

Failure to make these payments is likely to impair irreparably the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their employees at a time when the employees' support is critical to the Chapter 11 Cases and sale efforts. Further, absent the relief requested, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as many employees rely on their wages and benefits to meet their personal financial obligations.

41.     I have reviewed the Employee Wage Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Employee Wage Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion should be approved.

       **f.**    **Utilities Motion**

42.     The Debtors request entry of interim and final orders (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion and the adequate assurance procedures annexed as Exhibit 1 to Exhibit A to the Utilities Motion and (e) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

-13-

43.     In the ordinary course of business, the Debtors obtain telephone, internet and other similar utility services from various Utility Providers (other typical utilities such as gas and electric are not billed to the Debtors directly, but rather are obligations of the Debtors' respective landlords which then bill the Debtors for such services on a monthly basis as part of the respective CAM charges under each lease at each of the Debtors' business locations). A list of the Utility Providers that provide services to the Debtors as of the Petition Date is set forth on Exhibit 2 to the proposed Interim Order submitted with the Utilities Motion.

44.     The Debtors intend to pay post-petition obligations owed to the Utility Providers in a timely manner. Contemporaneously herewith, the Debtors have filed a motion seeking authority to use its Cash Collateral. The Debtors expect that cash flows from operations as well as cash on hand as of the Petition Date will be sufficient to pay post-petition obligations related to their utility services. To provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit an amount equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over the past twelve months – into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date.

45.     If a Utility Provider is not satisfied with the Proposed Adequate Assurance, any such Utility Provider may make Requests for additional or different adequate assurance of future payment pursuant to the Adequate Assurance Procedures. The Adequate Assurance Procedures set forth a streamlined process to enable Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted. More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and

-14-

serving a Request upon the Notice Parties (as defined in the Adequate Assurance Procedures) within a specified period of time. The Debtors may then resolve, in their discretion, subject to the objection of any party with an interest in and to its Cash Collateral, any Request by mutual agreement with the Utility Provider and without further order by the Court. If the Request or any objection, cannot be resolved, the Debtors request the right to seek a hearing with the Court to resolve the Request and/or objection. Furthermore, the Adequate Assurance Procedures set forth notice procedures to Utility Providers subsequently added to the Utility Service List. Subsequently added Utility Providers will also be bound by the Adequate Assurance Procedures. The Debtors request that the relief granted in the Interim Order and the Final Order apply to all Utility Providers rendering utility services to the Debtors and not be limited to those listed on the Utility Service List.

46.      Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is critical that utility services continue uninterrupted during the chapter 11 cases.

47.      I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

-15

**g.**     **Pending Tax Payments, Sales Tax/ Use Tax Motion.**

48.     The Debtors (a) collect sales taxes from their customers, (b) incur franchise taxes, (c) incur fees necessary to operate their businesses including license fees, annual reporting fees, and other similar assessments, and (d) remit such Taxes and Fees to various taxing, licensing and other governmental authorities throughout the United States (collectively, the "***Authorities***"). A list of the Authorities is attached to the Tax Motion as Exhibit B.   The Debtors pay the Taxes and Fees monthly, bi-monthly, quarterly, semi-annually, annually as required by applicable laws and regulations.

49.     The relief requested is appropriate because a portion of the taxes is likely not property of the Debtors' estate under section 541(d) of the Bankruptcy Code.  Moreover, non-payment of the prepetition taxes and fees will cause immediate and irreparable harm to the Debtors because it (a) would cause the Debtors to incur substantial, irreversible tax penalties from governmental authorities that are likely to be paid in full and in cash as priority claims under the Bankruptcy Code, (b) could result in governmental authorities imposing liens related to non-payment of property taxes under the Bankruptcy Code, (c) could prevent the Debtors from operating their businesses and (d) could expose certain directors and officers of the Debtors to personal liability.  Accordingly, the Debtors must continue to pay such amounts as they become due to ensure that they remain focused on operating the business and implementing a successful restructuring.

50.     I have reviewed the Taxes Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

-16-

continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

### h.    Use of Cash Collateral Motion

51.    The Debtors and their advisors have worked to ensure that upon the commencement of these chapter 11 cases, the Debtors would have access to the cash on hand as well as to additional revenue from operations as and when same is paid to the Debtors. Having access to cash on hand as well as future revenues, as and when received will provide sufficient liquidity for the Debtors to remain current on all post-petition financial obligations.   With this background, the Debtors embarked upon discussions with the Debtors prepetition senior secured lender Liberty Lenders.

52.    Liberty Lenders has agreed to allow the Debtors to utilize their cash on hand as well as continuing revenues as and when received to pay post-petition obligations, requiring the Debtors only to provide a replacement lien in and to its future receipts but only to the extent of the use of such Cash Collateral and only to the same extent and priority as the liens Liberty Lenders held in the Debtors' Cash Collateral pre-petition.   Further, the Debtors have also provided similar replacement liens to the Seller Notes, again, only to the extent of the use of their Cash Collateral and only to the same extent and priority as the liens held by the Seller Notes in the Debtors' Cash Collateral pre-petition. The Debtors believe the replacement liens and other adequate protection offered to its secured lenders is sufficient adequate protection to allow it to use its Cash Collateral as set forth, and requested, in the Cash Collateral Motion.

53.    To implement its proposed sale process and continue to retain and inspire confidence in its business partners, access to liquidity is critical.  In short, to ensure the Debtors

-17-

have access to liquidity and inspire confidence in the marketplace in demonstrating the Debtors have the funding and financial support necessary to conclude a successful sale, the Debtors submit using its Cash Collateral is necessary and should be approved.

54.     The Debtors request entry of the Cash Collateral Orders, authorizing them to utilize their Cash Collateral and as adequate protection therefor, to provide replacement liens to its secured creditors to the extent of its use of their Cash Collateral and to pay certain expenses for Liberty Lenders. As set forth in the Interim Cash Collateral Order, the Debtors believe that providing the adequate protection provided therein is in the best interest of the Debtors and their estates. In support of this motion, the Debtors rely on the First Day Declaration and submit the Declaration of Michael Fuqua, a senior managing director of Glass Ratner Advisory & Capital Group LLC ("*Glass Ratner*"), the Debtors' proposed financial advisors, filed contemporaneously herewith (the "*Fuqua Declaration*").

55.     In the face of these chapter 11 cases, absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may choose not to ship goods or provide service to the Debtors, resulting in disruption to the Debtors' supply chain. Any disruption in the Debtors' supply chain at this critical juncture would cause a severe reduction in the Debtors' cash on hand.

56.     Immediate access to the use of Cash Collateral will enable the Debtors to allay concerns of the Debtors' suppliers and customers and enable the Debtors to carry on with business as usual. Absent access to liquidity, the Debtors' ability to operate and ultimately sell

their assets as a going concern will be jeopardized, all to the detriment of the Debtors' stakeholders. As a result, the Debtors have an immediate need to secure the use of the Cash Collateral to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

57.    To best assess the Debtors' funding needs during these chapter 11 cases, the Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful sale of their assets. The Debtors developed a 12-week cash flow forecast that considers any savings derived by the filings of these cases, and the Debtors' ability to maintain customary payment terms with key suppliers.

58.    Based on the Debtors' financial projections, the Debtors concluded that cash on hand alone would be sufficient to fund operations and the Debtors' business plan throughout the pendency of these chapter 11 cases. Thus, it is critical that the Debtors have access to their cash on hand and continuing revenues as and when received to provide the Debtors with appropriate and necessary liquidity to ensure that operations would continue uninterrupted during these chapter 11 cases.

In conclusion, for the foregoing reasons and the reasons set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as is appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Declaration.

Juliet Reising
Chief Financial Officer, Secretary

-19-

PHIL1 3337841v.1