## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EDGENET, INC.*et al.*,[1] | ) Case No. 14-10066 (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES, OTHER COMPENSATION AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS

Edgenet, Inc. and its debtor affiliate, Edgenet Holding Corporation as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully represent:

### Jurisdiction

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested herein are sections 105(a), 363 and 507(a)(4)-(5), 1107 and 1108(a) of the Bankruptcy Code, Rules 6003, 6004(h), 7062 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Edgenet, Inc. (4977)); Edgenet Holding Corporation (4146). The Debtors' main corporate address is 8 Piedmont Center, 3525 Piedmont Road, Suite 420, Atlanta, GA 30305.

## Introduction[2]

1.  The Debtors are providers of cloud based content, applications and services that enable companies to sell more products and services with greater ease across multiple channels and devices. The Company's solutions feature patented and patent pending content, guide, catalog, configuration and engineering offerings for selling products and services on mobile, web and in-store platforms. Its solutions allow customers to address the ever increasing demand by consumers for credible shopping experiences that deliver detailed information and relevant knowledge in intuitive ways to identify, research and purchase products and services.

2.  The Debtors have three business locations: Waukesha, WI, Brentwood, TN and its main office in Atlanta, GA. The Debtors currently have approximately 80 employees spread across their three business locations.

3.  On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to allow the Debtors to move forward with the sale of their assets. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

---

[2]  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Juliet Reising, the Chief Financial Officer and Secretary of Edgenet, Inc., in Support of First Day Pleadings (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

2

## Relief Requested

4. To minimize the personal hardship that the Debtors' employees will suffer if certain prepetition amounts are not paid when due or as expected, and to maintain the morale of an essential workforce during this critical time, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "*Interim Order*" and the "*Final Order*," respectively), (a) authorizing the Debtors to pay prepetition wages, salaries, other compensation and reimbursable employee expenses, (b) authorizing the Debtors to continue employee benefits programs, (c) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition employee obligations (collectively, and as described herein, the "*Employee Obligations*"),[3] (d) scheduling a final hearing (the "*Final Hearing*") to consider entry of the Final Order (to the extent a Final Hearing is necessary) and (e) granting such other and further relief as may be appropriate.

5. Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture. The Debtors' payroll for the period ending January 15, 2014 has already been funded to ADP (for payment in the January,

---

[3] The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "*Official Policy*"). In the event of any inconsistency or ambiguity between the summary contained in this motion and an Official Policy, the terms of such Official Policy shall govern.

PHIL1 3327382v.3

15, 2014 payroll) and debited from the Debtors' payroll account on January 10, 2014, prior to the Petition Date. Accordingly, pursuant to the Interim Order, the Debtors seek authority to continue to honor, pay, satisfy or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations discussed herein.

6.     Specifically, the Debtors seek authority to pay or honor the following Employee Obligations, in an interim aggregate amount not to exceed $12,475 per Employee upon entry of the Interim Order:

| Employee Obligation | Interim Amount |
| --- | --- |
| Unpaid Wage Obligations | $25,000 |
| Unpaid Payroll Service Fees | $3,000 |
| Unremitted Deductions | $0 |
| Unremitted Payroll Taxes | $0 |
| PTO | $25,000 |
| Unpaid Health Benefits | $unknown |
| FSA Administrative Fee | $0 |
| Life and AD&D Insurance | $0 |
| Disability Insurance | $0 |
|  | **$53,000 known** |

7.     Lastly, the Debtors will seek the authority, solely upon entry of the Final Order, to honor, pay, satisfy or remit certain claims and prepetition obligations related to the following Employee Obligations (each as defined and discussed herein)-- Unused PTO, owed to the Debtors' current and former Employees, to the extent that such prepetition amounts are outstanding.

## The Debtors' Workforce and Wage and Benefit Obligations

### A.     Overview of the Debtors' Workforce

8.     The Debtors currently employ approximately 77 employees (collectively, the "*Employees*"), including approximately 76 full-time employees (collectively, the "*Full-Time Employees*") and 1 part-time employee (collectively, the "*Part-Time Employees*"). The Debtors pay approximately 1 employee (1%) on an hourly basis (approximately $1,100 per pay period)

4

and approximately 76 employees (99%) on a salaried basis. In addition, the Debtors supplement their business needs and workforce with approximately 3 independent contractors (the "**Independent Contractors**"), who provide niche services.

9.     The Employees perform a variety of critical functions, including software development, customer service and technical support, data base administration, finance, administration, data services, information technology, sales and marketing, product management and related services. The Independent Contractors provide a range of different services, including sales and customer service support, visual selling systems support and credit and collection services. The Employees' and Independent Contractors' valuable skill sets, institutional knowledge and understanding of the Debtors' operations and customer relations make them essential to the success of these chapter 11 cases.

10.     Further, just as the Debtors depend on the Employees and Independent Contractors to operate their businesses on a daily basis, these individuals also depend on the Debtors for their livelihood. Indeed, the vast majority of these individuals rely exclusively on payments received from the Debtors for their basic living necessities. The Employees and Independent Contractors will be exposed to significant financial difficulties if the Court does not permit the Debtors to pay the Employee Obligations in the normal course of business.

**B.     Wages and Compensation**

11.     In the ordinary course of business, the Debtors pay to their Employees and Independent Contractors wages, salaries, overtime, commissions, incentive bonuses, reimbursable expenses and certain other forms of compensation described herein (collectively, the "**Employee Compensation**").

12.     As of the Petition Date, the Debtors estimate that Employees and Independent Contractors are owed an aggregate amount of approximately $3,000 on account of accrued

5

Employee Compensation earned prior to the Petition Date (the "*Unpaid Wage Obligations*").

The vast majority of the Debtors' Unpaid Wage Obligations for the period ending January 15, 2014 have already been funded to ADP (for payment in the January 15, 2014 payroll) or to ING (for certain payroll deducted benefits such as 401(k) contributions) and debited from the Debtors' account on January 10, 2014. As described herein, the Debtors seek authority to pay their Employees and Independent Contractors any Unpaid Wage Obligations, in an aggregate amount not to exceed $12,475 per Employee or Independent Contractor. The following summarizes the various types of Employee Compensation offered by the Debtors.

      *(i)*     *Wages*

13.     The Debtors pay the Full-Time Employees on either an hourly or salaried basis. Part-Time Employees are paid on an hourly basis and Independent Contractors are paid either on an hourly basis or on a monthly fee basis. The Debtors' Employees and Independent Contractors are paid semi-monthly on the 15th (or last business day of the month before the 16th of the month) and on the last business day of the month, each pay being two weeks in arrears (*i.e.*, paychecks distributed on January 15, 2014 paid wages earned from January 1, 2014 to January 15, 2014). The Debtors' average semi-monthly gross payroll for all of its Employees and Independent Contractors is approximately $ 330,000. Independent Contractors are paid as invoiced, which can be weekly or monthly; amounts to Independent Contractors approximate $5,900 per month.

14.     The Debtors' payroll is administered by Automatic Data Processing, Inc. ("*ADP*"), a third-party service provider, which distributes payroll, either directly to the Employees and Independent Contractors via check or through direct deposits with funds advanced by the Debtors to ADP. The Debtors' payroll for the period ending January 15, 2014 has already been paid to ADP and debited from the Debtors' payroll account. Although the Debtors have paid their wage and salary obligations in accordance with their payroll schedule, as

6

of the Petition Date, certain prepetition wage obligations have accrued and remain outstanding. More specifically, while the Debtors believe that virtually all sums for wages for the period January 1-15, 2014 were funded to ADP or to ING for certain payroll related deductions prepetition and were then paid by ADP or ING on January 15, 2014 from their respective accounts, it is possible certain amounts may be outstanding on account of unpaid compensation because of (a) the timing of the payroll schedule and the Petition Date, (b) discrepancies existing as to amounts paid and the amounts that should have been paid and (c) some payroll checks being issued prior to the Petition Date that have not yet been presented for payment.[4] As a result, the Debtors seek authority to pay and honor outstanding prepetition wage and salary obligations on a post-petition basis in the ordinary course of business.

### *(ii)* *Commission Payments*

15.    In addition to the wage and salary obligations, certain of the Debtors' Employees are entitled to earn commission payments. In particular, the Debtors pay commissions to 6 employees with the titles of SVP, Sales and Marketing; VP Specialty Sales; VP Marketing; VP Sales; Retail and Specialty Sales Rep; and Specialty Sales Rep (collectively, the "*Sales Associates*"). Sales Associates are responsible for driving new customers to the Debtors. The Sales Associates earn commissions based on billings (as defined) and are paid commission payments based on collected billings (as defined) each month (the "*Sales Commissions*"). The Sales Commissions are paid monthly in arrears, and the Debtors' next monthly payment of Sales

---

[4]    Since the January 15, 2014 payroll in the ordinary course was paid by the Debtors to ADP or ING prior to the Petition Date, the Debtors do not believe the payment of the payroll by ADP or ING to, or on behalf of the Employees from their respective accounts post-petition requires court approval. Such information is disclosed herein out of an abundance of caution, in the event it is determined that Court approval is required. In the event that it is determined that court approval is required, the payment of the January 15, 2014 payroll will not cause the Debtors to pay any one employee more than 12,475, as any employee who would be eligible to receive more, would be capped at the statutory amount.

7

Commissions earned in December is scheduled to be paid on January 31, 2014. The Sales Commissions are estimated to be in the aggregate amount of approximately $22,000, which amounts, in conjunction with the other Unpaid Wage Obligations, will not exceed $12,475 per Employee. The Debtors seek authority to pay the Sales Commissions on a post-petition basis in the ordinary course of business.

### (iii) *Reimbursable Expenses*

16.     In the ordinary course of business, the Debtors reimburse Employees for approved reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment, in accordance with the Debtors' policies (collectively, the "*Reimbursable Expenses*"). Reimbursable Expenses include business-related travel expenses, including food and lodging and continuing education expenses, according to the Debtors' policies.

17.     All business travel is approved in advance by the Employee's immediate manager and second level manager and Employees make all travel arrangements through the Debtors' designated travel agency. Employees generally submit expense reports for travel expenses within 2 weeks after the Reimbursable Expenses were incurred, and the Debtors pay Reimbursable Expenses weekly by direct deposit.

18.     The Debtors pay approximately $80,000 per month on account of Reimbursable Expenses. Although the Debtors request that Employees submit reimbursement requests promptly, not all Employees are able to do so and, as a result, it is difficult for the Debtors to precisely estimate the amount of Reimbursable Expenses outstanding as of the Petition Date. Based on historical practice, the Debtors estimate that, as of the Petition Date, approximately $20,000 in total Reimbursable Expenses remain unpaid (the "*Unpaid Reimbursable Expenses*").

19.     The Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse the Employees.

8

Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses, and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to pay the Reimbursable Expenses and continue reimbursing the Reimbursable Expenses in accordance with prepetition practices and in the ordinary course of their businesses.

## C.    The Debtors' Payroll Fees

20.    The majority of the Debtors' Wage Obligations are made by direct deposit through the electronic transfer of funds from the Debtors' payroll department to ADP, which then directly transfers funds to each Employee's bank account, with the remaining Employees receiving checks.

21.    Specifically, ADP is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state and local tax filings. In addition, for each payroll period, ADP processes direct deposit transfers and administers payroll checks to Employees from certain disbursement accounts funded by the Debtors with the amounts necessary to satisfy the Debtors' payroll obligations. ADP is crucial in providing the Debtors with a payroll system that functions seamlessly.

22.    The Debtors incur approximately $15,000 per year in fees for ADP's services. As of the Petition Date, the Debtors estimate that approximately $3,000 has accrued and remains outstanding on account of fees owed to ADP for services rendered prepetition (the "***Unpaid Payroll Service Fees***"). By this motion, the Debtors seek authority to remit the Unpaid Payroll Service Fees.

9

**D.     Deductions and Payroll Taxes**

23.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' gross pay, including garnishments, child support and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions (collectively, the "*Deductions*"). Either the Debtors or a third-party service provider then forwards the Deductions to the appropriate recipients. On average, the Debtors remit to third-party recipients approximately $260,000 per month on account of Deductions. As of the Petition Date, the Debtors believe they have remitted all Deductions withheld to ADP or ING for transmission to the appropriate third-party recipient.

24.     Additionally, the Debtors are required by law to withhold amounts related to federal, state and local income taxes, including social security and Medicare taxes and employment insurance, for remittance to the appropriate taxing authorities (collectively, the "*Employee Payroll Taxes*"). Moreover, the Debtors are required by applicable statutory authority to pay from their own funds Social Security and Medicare taxes and, based on a percentage of gross payroll, additional amounts for federal and state unemployment and short-term disability insurance (the "*Employer Payroll Taxes*" and, together with the Employee Payroll Taxes, the "*Payroll Taxes*"). On average, the Debtors remit approximately $54,000 per month for Payroll Taxes. As of the Petition Date, the Debtors believe they have remitted all Payroll Taxes to ADP for transmission to the proper recipients.

25.     The Debtors believe that, because the Deductions and certain Payroll Taxes are held for payment to third-parties, they are properly deemed to be held in trust and thus do not constitute property of the Debtors' estates.[5]   Out of an abundance of caution, however, the Debtors seek authority to remit the any unremitted deductions and unremitted payroll taxes and continue collecting and remitting the unremitted deductions and unremitted payroll taxes in the ordinary course of business on a post-petition basis.

### E.     Paid Time Off Policies

26.     Full-Time Employees who have completed 90 days of service are eligible for paid time off ("PTO") (the "*PTO-Eligible Employees*") receive PTO which covers all vacation, holiday, personal and sick time.  Employees with up to three years of service accrue 120 hours per calendar year and those with four to ten years of service accrue 160 hours per calendar year. For those employees with more than 10 years of service accrue 200 hours per calendar year. Employees may carry over PTO into the next calendar year, typically 40 hours; however, additional carryover can be approved by the CEO and the CFO.

27.     As of the Petition Date, accrued and unused PTO was valued at approximately $122,000.  This amount, however, is not a current cash obligation, as PTO-Eligible Employees are entitled to be paid for unused PTO upon departure in accordance with local law.

28.     The Debtors also maintain a policy whereby full time employees and part-time employees who are regularly scheduled to work 30 or more hours a week receive compensation for certain non-working holidays (the "*Paid Holidays*").  The Debtors observe 9 Paid Holidays per calendar year.

---

[5]   In the ordinary course, the Debtors submit any unremitted reductions and unremitted payroll taxes to ADP which then remits the funds to the appropriate third-party recipients.

29.     The Debtors seek authority to continue honoring PTO, including PTO taken and not yet paid before the Petition Date, in an amount not to exceed $25,000 pursuant to the Interim Order in accordance with payroll policies, and to pay earned and unused PTO upon departure of a PTO-Eligible Employee, if any, when such obligations become due and owing, solely pursuant to the Final Order (the "*Unused PTO*").  The Debtors also seek authority to continue honoring Paid Holidays in the ordinary course of business on a post-petition basis.  Moreover, the Debtors anticipate that their PTO-Eligible Employees will utilize any accrued PTO in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**F.      Employee Benefit Programs**

30.     The Debtors offer their Full-Time Employees and Part-Time Employees who are regularly scheduled to work 30 or more hours per week (collectively, the "*Eligible Employees*") the opportunity to participate in a number of insurance and benefit programs including, among other things, medical, dental and vision plans, participation in flexible spending accounts, workers' compensation, life insurance, supplemental insurance, short and long-term disability insurance and other fringe benefit plans as described below (collectively, the "*Employee Benefits*").  The Employee Benefits begin on the first day of the month following the date of hire of an Eligible Employee.

**(i)      Health Benefit Plans**

31.     The Debtors offer Eligible Employees and their eligible dependents (collectively, the "*Dependents*") the opportunity to participate in a number of health benefit plans, including medical, prescription, dental and vision plans (collectively, the "*Health Benefit Plans*").

> a.      Medical and Prescription Drug Plans.  Blue Cross Blue Shield of Georgia administers the Debtors' medical plans and the Debtors' prescription drug coverage plans for

12

approximately 72 covered Employees (the "***Medical Plan***"). The Debtors' average monthly cost to administer the Medical Plan is approximately $45,000, net of Employee contributions. As of the Petition Date, the Debtors do not believe there are any pre-petition amounts owed to Blue Cross Blue Shield of Georgia under the Medical Plan.

b.      Dental Plan.  Guardian administers the Debtors' dental plans for approximately 72 covered Employees (the "***Dental Plan***"). The Debtors' average monthly cost to administer the Dental Plan is approximately $5,000. As of the Petition Date, the Debtors do not believe there are any pre-petition amounts owed to Guardian under the Dental Plan.

c.      Vision Plan.  Blue Cross Blue Shield of Georgia administers the Debtors' vision benefits plan for approximately 72 Employees (the "***Vision Plan***"). The Vision Plan is almost completely funded by the participating Employees. The Debtors' average monthly cost to administer the Vision Plan is approximately $1,000. As of the Petition Date, the Debtors do not believe there is any amount owed to Blue Cross Blue Shield of Georgia under the Vision Plan.

32.     The Debtors estimate that, as of the Petition Date, no amounts are owed on account of the Health Benefit Plans. The Debtors request authority to: (a) continue the Health Benefit Plans for Eligible Employees; (b) continue making the above-described contributions to such Health Benefit Plans; and (c) pay any amounts related thereto, including premiums, claim amounts and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business.

### (ii)    *Flexible Spending Accounts and Health Savings Accounts*

33.     The Debtors also offer Eligible Employees the ability to contribute part of their pre-tax compensation to several flexible spending accounts to pay for qualified out-of-pocket health care and dependent care expenses (the "***Flexible Spending Accounts***"), administered by UnitedHealthCare. Eligible Employees who enroll in the Consumer Driven Health Plan also

13

have the ability to contribute pre-tax compensation to an individual savings account to be used for eligible medical expenses (the "***Health Savings Accounts***").

34.    Approximately 21 Eligible Employees contribute to Flexible Spending Accounts and Health Savings Accounts and the Debtors withhold approximately $4,200 per month from paychecks for those Employees who chose to contribute to the Flexible Spending Accounts. Employees with Flexible Spending Accounts are reimbursed directly by Edgenet for eligible medical expenses as claims are processed by Process Works. The Debtors pay Process Works a fee of approximately $100 each month for administration of the Flexible Spending Accounts (the "***FSA Administrative Fee***"). Employees with Health Savings Accounts each have an individual account with Bancorp. The Debtors seek authority to continue offering the Flexible Spending Accounts and Health Savings Accounts to certain of its Employees, to continue reimbursing the Eligible Employees and to continue paying the FSA Administrative Fee to Process Works, on a post-petition basis in the ordinary course of business.

### *(iii)    Workers' Compensation Programs*

35.    The Debtors maintain workers' compensation insurance for their Employees at the mandated level required by each state in the U.S. in which the Debtors operate (the "***Workers' Compensation Program***"). The Debtors maintain their Workers' Compensation Program with The Hartford. The Debtors pay a total of approximately $22,230 in annual premiums for the Worker's Compensation Policy, which has been paid in advance through 7/31/2014.

36.    As of the Petition Date, the Debtors do not owe any amount in prepetition Workers' Compensation Policy Premiums. The Debtors request authority to continue the Workers' Compensation Program for Eligible Employees and to pay any future premiums in the ordinary course of business.

14

### (iv)   *Life and Accidental Death and Dismemberment Insurance*

37.    The Debtors provide Eligible Employees with primary life insurance and accidental death and dismemberment insurance (the "*Life and AD&D Insurance*") through Guardian. The coverage provided by these policies costs the Debtors approximately $2,000 per month. As of the Petition Date, the Debtors believe that they owe nothing on account of Life and AD&D Insurance coverage. The Debtors seek authority to continue providing Life and AD&D Insurance to the Eligible Employees and to honor any prepetition obligations that are related thereto.

38.    In addition, Eligible Employees have the option to purchase supplemental life insurance and accidental death and dismemberment insurance through Guardian (collectively the "*Supplemental Life Insurance*").    The Supplemental Life Insurance is 100% paid by participating Eligible Employees and approximately $450 in premiums are withheld from Eligible Employees' paychecks each month. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Guardian on account of the Supplemental Life Insurance. The Debtors seek authority to continue providing Supplemental Life Insurance to the Eligible Employees on a post-petition basis in the ordinary course of business.

### (v)   *Disability Insurance*

39.    The Debtors provide Eligible Employees with core short-term and long-term disability insurance (the "*Disability Insurance*") through Guardian. The coverage provided by these policies costs the Debtors approximately $3,000 per month. As of the Petition Date, the Debtors estimate that no amounts are owed on account of Disability Insurance coverage. The Debtors seek authority to continue providing Disability Insurance to the Eligible Employees and to honor any prepetition obligations that are related thereto.

### (vi)    Voluntary Insurance

40.    Eligible Employees have the option to purchase voluntary accident, critical illness and whole life insurance through AFLAC (the "*Voluntary Insurance*"). The Voluntary Insurance is 100% paid by participating Eligible Employees and approximately $450 in premiums are withheld from Eligible Employees' paychecks each month. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to AFLAC on account of the Voluntary Insurance. The Debtors seek authority to continue providing Voluntary Insurance to the Eligible Employees on a post-petition basis in the ordinary course of business.

### (vii)    Fringe Benefits

41.    The Debtors also provide a variety of fringe benefits (the "*Fringe Benefits*") for their Employees. The Fringe Benefits include:

- Employee Assistance Program. Full-Time Employees and Part-Time Employees working at least 24 hours per week are eligible for the Employee Assistance Program (the "*EAP*"). The EAP provides up to three sessions per year of free counseling and additional resources available online and by phone.

- Cell Phone Allowance. Certain Employees are offered an allowance against their monthly cell phone service. The allowance for most employees is $115 per month, however a few employees are reimbursed for actual cell phone usage.

The Fringe Benefits are part of the Debtors ongoing operating expenses and are not considered a separate cash obligation. The Debtors request authority to continue offering the Fringe Benefits to its Employees on a post-petition basis in the ordinary course of business.

### G.    401(k) Retirement Savings Plan

42.    The Debtors participate in a qualified 401(k) retirement savings plan administered by ING (the "*401(k) Plan*") for all Full-Time and Part-Time Employees (collectively, the

"*401(k) Eligible Employees*"). The Debtors auto-enroll the 401(k) Eligible Employees after 1 day of employment and, as a result, approximately 53 Employees participate in the 401(k) Plan.

43. The 401(k) Plan is funded by Employees, and the Debtors may provide a discretionary company match (the "*401(k) Match Contributions*"). The amount of the 401(k) Match Contributions for each year is discretionarily determined at the beginning of each fiscal year and funded in each pay period. Currently the matching contribution 100% of the employee's contribution up to a maximum of 3% of the employee's annual cash compensation up to the limits as allowed by law. The Debtors provided $152,276 of 401(k) Match Contributions in 2012 and $151,834 in 2013.

44. The Debtors seek authority to continue the 401(k) Plan on a post-petition basis in the ordinary course of business.

<u>**Supporting Authority**</u>

A. **The Court Should Authorize the Debtors to Honor Their Employee Obligations**

    (i) *Certain of the Employee Obligations are Entitled to Priority Treatment*

45. Pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code, certain of the unpaid prepetition Employee Obligations – including Unpaid Wage Obligations – are entitled to priority treatment in an amount up to $12,475 for each individual Employee or Independent Contractor. To the extent such claims are afforded priority status, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries or commissions, including vacation, severance and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).

46. In addition, and as noted above, the Debtors are not seeking authority in the Interim Order to pay Unpaid Wage Obligations in amounts that exceed $12,475 per Employee or

17

Independent Contractor. Accordingly, granting the relief sought with respect to compensation only affects the timing of payments to Employees or Independent Contractors, and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Wage Obligations up to $12,475 per individual will enhance value for the benefit of all stakeholders because it will help ensure that the Employees – the lifeblood of the Debtors' business operations – continue to provide vital services to the Debtors at this critical juncture. The Debtors believe that finding and attracting qualified talent would be extremely difficult and most likely would require higher salaries, guaranteed bonuses and overall higher cost compensation packages than are currently provided to the Debtors' Employees, should the Debtors be unable to honor the Employee Obligations when due and payable.

### *(ii)* *Payment of Certain of the Employee Obligations is Required by Law*

47.     The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain deductions, including contributions to the Employee Benefits programs and child support and alimony payments, are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b).

48.     Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988)

18

(noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Unremitted Deductions and Unremitted Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize the Debtors to transmit the Unremitted Deductions and Unremitted Payroll Taxes to the proper parties in the ordinary course of business.

49.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states, and therefore is crucial to the continued operation of the Debtors' businesses.

**B.     Payment of the Employee Obligations is Warranted Under the Doctrine of Necessity**

50.     Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code.

51.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries charged with "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re*

19

*CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Inherent in a debtor in possession's fiduciary duties is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled "only . . . by the preplan satisfaction of a prepetition claim." *Id.* Indeed, the *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

52.     Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).[6]

53.     In addition to the authority granted a debtor in possession under sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of

---

[6]     Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit preplan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization matter, that the court was not "helpless" to apply the rule to supply creditors where the alternative was the cessation of operations). The United States Court of Appeals for the Third Circuit which recognized the doctrine of necessity in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

54.     In *Lehigh*, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. at 824-45 (noting that debtors may pay prepetition claims that are essential to continued operation of the business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

55.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr.

21

N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . . ."); Collier on Bankruptcy P 105.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

56.     Here, the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption.  In the absence of such payments, the Debtors believe that their Employees and Independent Contractors may seek alternative employment opportunities, perhaps with the Debtors' competitors.   Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet its customer obligations and likely diminish creditors' confidence in the Debtors.  Moreover, the loss of valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations and other reorganization efforts.

57.     The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested herein.  Indeed, courts in

this jurisdiction have approved relief similar to the relief requested in this motion. *See, e.g., In re Conexant Systems, Inc.*, No. 13-10367 (MFW) (Bankr. D. Del. Mar. 1, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr D. Del. Jan. 30, 2013) (same); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012) (same); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) (same); *In re A123 Systems, Inc.*, Case No. 12-12859 (KJC) (Bankr D. Del. Oct. 18, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same).[7]

## C.  Cause Exists to Authorize and Direct the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers

58.     The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves, expected cash flows from ongoing business operations and anticipated access to cash collateral.  Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made to an Employee.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Employee Obligations.

---

[7]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

## The Requirements of Bankruptcy Rule 6003 are Satisfied

59.     As described above, the Debtors are seeking authority pursuant to the Interim Order to pay certain of the Employee Obligations during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the payment of the Employee Obligations within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. Proc. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

60.     The Debtors' Employees are integral to their operations. Failure to satisfy obligations to Employees in the ordinary course of business will jeopardize Employee loyalty and trust, possibly causing Employees to leave the Debtors' employ and thereby disrupting the Debtors' operations to the detriment of all parties in interest. Moreover, the Debtors' Employees rely on the Debtors' timely payment of their compensation and provision of benefits. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and seek authority to pay the Employee Obligations described herein pursuant to the Interim Order.

## Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

61.     To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

PHIL1 3327382v.3

## The Debtors' Reservation of Rights

62.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.    The Debtors expressly reserve their rights to contest any Employee Obligation.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

63.     The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Debtors' secured lender, Liberty Partners Lenders, L.L.C.; (d) counsel to the Debtors' landlords; (e) the Owners Representative regarding the Seller Notes and counsel thereto; (f) the Delaware Secretary of State; (g) the Delaware Secretary of Treasury; (h) the Delaware State Attorney General; (i) the Office of the United States Attorney General for the State of Delaware; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; and (l) Delaware Division of Revenue.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

64.     No prior motion for the relief requested herein has been made to this or any other court.

PHIL1 3327382v.3

WHEREFORE, for the reasons set forth herein and the First Day Declaration, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) authorizing the Debtors to pay prepetition wages, salaries, other compensation and reimbursable employee expenses, (b) authorizing the Debtors to continue employee benefits programs, (c) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition Employee Obligations, (d) scheduling a Final Hearing to consider entry of the Final Order (to the extent a Final Hearing is necessary) and (e) granting such other and further relief as may be appropriate.

Dated: January 14, 2014
      Wilmington, Delaware

/s/ *Raymond H. Lemisch*

Domenic E. Pacitti (DE Bar No. 3989)
Raymond H. Lemisch (DE Bar No. 4204)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:   (302) 426-1189
Facsimile:   (302) 426-9193

- and -

Morton Branzburg, Esquire
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:   (215) 569-2700
Facsimile:   (215) 568-6603

*Proposed Counsel to the Debtors*
*and Debtors in Possession*