THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EDGENET, INC., et al.,<br><br>                Debtors. | Chapter 11<br><br>Case No. 14-10066 (BLS)<br>Jointly Administered<br><br>Hearing Date:  May 5, 2014, at 10:00 a.m.<br><br>Objection Deadline:  April 28, 2014, at 4:00 pm, extended for the United States Trustee to April 29, 2014, at midnight |

**UNITED STATES TRUSTEE'S OBJECTION
TO THE DEBTORS' MOTION FOR AN ORDER (A) APPROVING SALE
PROCEDURES AND BIDDING PROTECTIONS IN CONNECTION WITH SALE OF
THE DEBTORS' ASSETS PURSUANT TO SECTIONS 363 AND 365 OF THE
BANKRUPTCY CODE; (B) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER APPROVAL OF THE SALE OF THE DEBTORS' ASSETS; (C)
APPROVING NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES FOR
AUCTION AND FOR HEARING ON APPROVAL OF ASSET PURCHASE
AGREEMENT AND SALE OF THE DEBTORS' ASSETS, AND ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (D) ESTABLISHING PROCEDURES FOR NOTICING AND
<u>DETERMINING CURE AMOUNTS; AND (E) GRANTING OTHER RELIEF</u>**

      Roberta A. DeAngelis, the United States Trustee for Region 3 ("U.S. Trustee"), by and through her undersigned attorney, hereby files this objection ("Objection") to the Debtors' Motion for an Order (A) Approving Sale Procedures and Bidding Protections in Connection with Sale of the Debtors' Assets Pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of the Debtors' Assets; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Asset Purchase Agreement and Sale of the Debtors' Assets, and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Establishing Procedures for Noticing and Determining Cure Amounts; and (E) Granting Other

Relief (Dkt. No. 199) (the "Bid Procedures Motion"), and in support of that Objection states as follows:

**PRELIMINARY STATEMENT**

1.  Although the Debtors' Bid Procedures Motion is ostensively to approve bidding procedures for the sale of all of their assets, baked into those procedures are requirements that are designed to evade § 503(c) of the Bankruptcy Code, as well as any negative ruling this Court may make on to the Debtors' pending motion to approve retention bonuses to their executives (Dkt. No. 86)(the "Bonus Motion").[1] The Bonus Motion is currently scheduled to be heard on May 14, 2014, *after* the hearing on the Bid Procedures Motion.

2.  The Bonus Motion, although styled as a motion for approval to assume and assign executory contracts under § 365 of the Code, is in fact a motion to approve a retention bonus program benefiting a number of the Debtors' insiders without compiling with the requirements of § 503(c) of the Bankruptcy Code. The Bonus Motion was originally scheduled to be heard on April 10. However, after both the U.S. Trustee and the Official Committee of Noteholders filed objections,[2] the Debtors adjourned the Motion to May 14. The Debtors' counsel has indicated that the Bonus Motion may not go forward on that date either.

3.  It appears that, instead risking a negative ruling on the Bonus Motion, the Debtors have determined to try another tack: incorporating into their bid procedures the requirement that any party bidding on the Debtors' assets must agree to take assignment of the

---

[1] The Debtors' Bonus Motion is titled *Debtor's Motion for Entry of an Order Authorizing the Debtors (A) to Assume and Assign Certain Executory Contracts as Modified (B) to Enter into Certain Post-Petition Contracts and (C) to Assign Certain Post-Petition Contracts.* Dkt. No. 86.

[2] A copy of the U.S. Trustee's Objection to the Bonus Motion is annexed hereto as **Exhibit A,** and incorporated herein.

Sale Bonus Agreements in favor of the Debtors' executives, and pay those executives an aggregate of over $1 million. Those bonus payments would then be credited, dollar for dollar, against the purchase price of the Debtors' assets. The bid of the Stalking Horse is $6.5 million; thus, the Debtors are proposing to pay nearly *one-sixth* of such purchase price to their executives, with the Debtors' estates receiving no benefit from that $1 million payment.

4. Nor is payment of the bonuses by the successful bidder dependent on this Court granting the Debtors' Bonus Motion. To the contrary, the bid procedures require all bids to comply with § 1.04 (e) of the Purchase Agreement. That section expressly provides that if the Debtors do not obtain an "Assignment Order" from this Court (defined as an order authorizing the Debtors to assume and assign the Sale Bonus Agreements), the buyer is still required to pay to each of the Debtors' executives the same amount they would have received if the Court had granted the Bonus Motion. *See* Purchase Agreement, a copy of which is attached hereto as Exhibit B, § 1.04(e).

5. Thus, it appears that the main goal of the bid procedures is not to obtain the highest and best bid for the Debtors' assets, but rather to pay the Debtors' executives bonuses that are disallowed under § 503(c), and to evade any order this Court may enter denying the Debtors' Bonus Motion. The bid procedures' requirements will also chill bidding, rather than encourage it, as discussed in more detail below.

6. The U.S. Trustee also objects to a provision in the proposed bid procedures order that gives the break-up fee superpriority administrative expense status. Such status is limited to those providing post-petition financing or allowing use of their cash collateral during the course of the Chapter 11 cases, neither of which applies to the Stalking Horse. The U.S. Trustee further objects to the break-up fee being calculated as 3% of the $6.5 million

Stalking Horse bid – which includes the $1 million to be paid to the Debtors' executives – instead of 3% of the approximately $5.5 million of proceeds the estates would actually receive from the Stalking Horse bid.

7. For these reasons, set forth in more detail below, the U.S. Trustee requests that the Bid Procedures Motion be denied.[3]

## JURISDICTION

8. Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine the Motion and this Objection.

9. Under 28 U.S.C. § 586, the United States Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that United States Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the United States Trustee as a "watchdog").

10. Under § 307 of title 11 of the United States Code (the "Bankruptcy Code" or "Code"), the United States Trustee has standing to be heard on the Motion and the issues raised in this Objection.

---

[3] The U.S. Trustee has issues with other aspects of the relief sought by the Bid Procedures Motion, which issues have been conveyed to counsel for the Debtors. Based on communications with counsel for the Debtors, counsel for the U.S. Trustee believes those issues are likely to be consensually resolved. To the extent they cannot be, however, the U.S. Trustee reserves the right to raise them at the hearing on Bid Procedures Motion.

## BACKGROUND

*General*

11. On January 14, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

12. The Debtors remain in possession of their assets and continue to manage their business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

13. No Official Committee of Unsecured Creditors has been appointed in this case. *See* Dkt. No. 54. However, the U.S. Trustee appointed an Official Committee of Noteholders on March 13, 2014 (the "Committee"). *See* Dkt. No. 141.

*The Bonus Motion*

14. On February 20, 2014, the Debtors filed the Bonus Motion, which seeks authorization to (a) assume certain Sale Bonus Agreements that had previously been executed by the Debtors' Key Management Team; (b) enter into Sale Bonus Agreements with a number of other executives; and (c) assign both the pre-petition and post-petition Sale Bonus Agreements to a purchaser of the Debtors' assets, should such sale take place. The motion provided almost no information about the bonuses to be paid, such as the names or titles of the 20 persons of the Key Management Team to receive such bonuses, how many were "insiders" as that term is defined in the Bankruptcy Code, or the amount of the bonuses each executive would receive, except that it disclosed in a footnote that the aggregate amount of Guaranteed Bonus was to be $ 1,013,744.50. *See* Motion, n. 4.

15. On March 3, 2014, the Debtors filed a Supplemental to the Motion. *See* Dkt. No. 99. In that Supplement, the Debtors provided the names and titles of the Key Management Team eligible for two types of bonuses, a Guaranteed Bonus and Discretionary Bonus (defined below), and the amounts of Guaranteed Bonus to be paid to each, although some of that information was filed under seal. *See* Dkt. Nos. 99 and 153. In the Supplement, the Debtors assert that only two of the twenty members of the Key Management Team are "insiders" (the CEO/President and the CFO). However, eight additional members have officer titles, consisting of two Senior Vice Presidents and six Vice-Presidents. *See id.* Of the remaining ten members of the Key Management Team, only three appear to be "nonmanagement" as that term is used in Code § 503(c)(1)(C)(i).

16. In the Supplement, the Debtors also disclosed that none of the "insiders" have received any bona fide job offers from any other company, which is a required element under Code section 503(c)(1)(A). *See* Bonus Supplement, Dkt. 99, ¶ 9.

17. The Motion, as supplemented, describes two types of bonuses. The first is the Guaranteed Bonus, which is available only to 20 individuals who are members of the Key Management Team. There are only two requirements for a member of the Debtors Key Management Team to receive their Guaranteed Bonus. First, the member must remain employed by the Debtors at the time of the closing of the sale of the Debtors' assets, or have been terminated without cause within 90 days of such closing. Second, the member must sign what is titled a "Sale Bonus Agreement," the purpose of which is explicitly stated on the first page to be, "to provide a financial incentive for certain executives *to remain employed* by the Company." *See* Bonus Motion, Ex. B, p. 2 (Dkt. No. 86-3, p. 2 of 42)(emphasis added).

18.     The Sale Bonus Agreement includes non-compete, non-disclosure, and non-solicitation provisions, as well as a release of the Debtors by the employee signatory. However, the members of the Key Management Team are already bound by non-compete, non-solicitation and non-disclosure provisions that were included in their original employment contract.  *See* Bonus Motion, ¶12.[4]

19.     The second type of bonus is the Discretionary Bonus.  This bonus is based on the sales price obtained for sale of the Debtors' assets, and would be available only if the Debtors sell their assets for a price exceeding $12.5 million.  In such case, the pool of funds available for the Discretionary Bonus would be 15% of the amount in excess of $12.5 million. *See* Bonus Motion, ¶16.

20.     Debtors' counsel has recently informed counsel to the U.S. Trustee that the Debtors will not be pursuing the Discretionary Bonus.  Therefore nothing further will be discussed in this Objection concerning the Discretionary Bonuses.

*The Bid Procedures Motion*

21.     On April 11, 2014, the Debtors filed the Bid Procedures Motion.  *See* Dkt. No. 199.  Rather than combining the sale motion with the Bid Procedures Motion, the Debtors filed a separate sale motion on that same date.  *See* Dkt No. 197 (the "Sale Motion").

---

[4]  Although paragraph 12 of the Bonus Motion states that non-solicitation provisions were not included in the original employment contracts, in the *Debtors' Omnibus Reply to Objections of the Official Committee of Noteholders and the United States Trustee to the Debtors' Motion for Authority to (A) Assume and Assign Certain Executory Contracts, as Modified, (B) Enter Into Certain Post Petition Contracts and (C) Assign Certain Post Petition Contracts*, the Debtors state that the prior agreement with employees did "contain non-solicitation, non-complete, and non-disclosure provisions."  *See* Dkt. 184, ¶ 11.

22. In the Bid Procedures Motion, the Debtors represented that the Stalking Horse bid was $6.5 million, subject to "certain adjustments" set forth in the Purchase Agreement. *See* Bid Procedures Motion, ¶ 21. The Bid Procedures Motion did not disclose the amount or nature of such adjustments. Rather, one must look to the Purchase Agreement, which is not attached to the Bid Procedures Motion, to determine the amount and nature of the "adjustments" to the Stalking Horse bid. For the Court's convenience, a copy of the Purchase Agreement, which was attached to the Sale Motion, is also attached hereto as **Exhibit B**. The Purchase Agreement provides, at § 1.06, that the aggregate purchase price for the Acquired Assets shall be equal to (i) $6.5 million, plus (ii) the assumption of the Assumed Liabilities (the "Purchase Price"); "provided, that Buyer shall receive *full credit*, as an offset against the Purchase Price, for the aggregate Buyer Cure Costs payable pursuant to § 1.04(d) [of the Purchase Agreement] and payment to Seller Employees under § 1.04(e) [of the Purchase Agreement]." Purchase Agreement, Ex. B hereto, § 1.06.

23. Section 1.04(d) of the Purchase Agreement provides that on or before the Bid Deadline, the Debtors shall obtain from this Court an Order (the "Assignment Order") authorizing the Debtors to assume and/or assign to Buyer at Closing the Contracts set forth on Schedule 1.04 (d) to the Purchase Agreement (the "SBA Contracts"). The Purchase Agreement attached to the Sale Motion does not have a Schedule 1.04 (d) attached. However, Debtors' counsel has informed counsel for the U.S. Trustee that it is anticipated that the only contracts on that schedule will be the Sale Bonus Agreements (SBA) with the Debtors' executives. Section 1.04(d) further provides that the buyer shall pay the Cure Cost with respect to each such assumed and/or assigned Sale Bonus Agreement, as set forth on Schedule 1.04 (d). Although the amounts

of the Cure Costs are not provided (because no Schedule 1.04(d) is attached), the Debtors' Bonus Motion indicated that they aggregate to $ 1,013,744.50.  *See* Dkt. No. 86, n. 4.

24. Section 1.04(e) of the Purchase Agreement provides that, "[i]n the event that the [Debtor] does not, for any reason, obtain the Assignment Order [which is an order approving the Bonus Motion] . . . . on or before the Bid Deadline," the Buyer still has to pay to each of the Debtors' executives the same amount such executives would have received had the Court granted the Bonus Motion.  However, in such instance the payment will be given another name.  With respect to any executives the Buyer wishes to employ, the Buyer would call the payment a "signing bonus," rather than a sale bonus; with respect to those executives the Buyer does not wish to employ, the Buyer is required to enter into an agreement with them containing terms consistent with that of the Sale Bonus Agreement, and paying such executives the same amounts they would have received if this Court had approved the Bonus Motion.  *See* Ex. B hereto, § 10.4(e)(i) & (ii).

25. Not only does the Purchase Agreement provide that the Stalking Horse Bidder will pay bonuses to the Debtors' executives even if the Court denies the Debtors' Bonus Motion, but the Bid Procedures require that all bidders agree to be bound by the same provisions.  Although not disclosed in the Bid Procedures Motion itself, the bid procedures that are attached to that Motion as Exhibit A (Dkt No. 199-2), include the following provision:

> Executory Contracts and Unexpired Leases
>
> The Bid shall identify with particularly each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to such Potential Bidder's Modified Purchase Agreement . . . . Further, the Bid shall provide that if the Debtors have obtained the Assignment Order [Order approving the Bonus Motion] . . . , the Potential Bidder shall comply with the obligations of Buyer under Section 1.04(d) of the Purchase Agreement and if no Assignment Order has been obtained by the

9

>Debtors, then the Potential Bidder shall comply with the obligations of Buyer under section 1.04(e) of the Purchase Agreement.

*See* Bid Procedures Motion, Ex. A (Dkt. No. 199-2) p. 4, ¶ II. 2.

***Each Signatory to the Sale Bonus Agreements Has Until the Sale Hearing to Decline Assignment of their Agreement to the Purchaser of the Debtors' Assets***

26. There is another important fact set forth in the Bonus Motion that does not appear to be included in the Bid Procedures Motion. In the Bonus Motion, the Debtors disclose that any executive of the Debtors that is a signatory to a Sale Bonus Agreement can reject the assumption and assignment of such agreement up until the conclusion of the hearing on the sale of the Debtors' assets. *See* Bonus Motion, Dkt. No. 86, ¶30. Thus, even if a potential bidder voluntarily wishes to take assignment of the Sale Bonus Agreements, it is left to the discretion of each of the Debtors' executives whether their agreement will ultimately be assigned to that bidder.

## **ARGUMENT**

27. Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to sell property of the estate outside the ordinary course of business. The debtor-in-possession bears the burden of proof to show that the sale is in the best interests of the creditors and the estate:

>The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a sound purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith.

*In re Exaris Inc.,* 380 B.R. 741, 744 (Bankr. Del. 2008), citing, *inter alia, In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986).

28. Initially, the Court should determine that the bidding procedures will bring the best and highest price for the debtors' assets. The Debtors must show that the assets have been fully marketed and that the sale is sufficiently publicized in order to prove that the assets will be sold for a fair and reasonable price. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.")

***The Bid Procedures Cannot Be Approved Because They Seek to Circumvent the Provisions of Section 503(c) of the Bankruptcy Code.***

29. The Debtors' bid procedures are not designed to bring the best and highest price for the Debtors' assets. Rather, they are designed as a way to pay the Debtors' executives bonuses without having to comply with § 503(c) of the Bankruptcy Code, or with any negative ruling this Court might make on the Bonus Motion. For that reason alone, they the Bid Procedures Motion must be denied.

30. For the reasons set forth in the U.S. Trustee's Objection to the Debtors' Bonus Motion (attached as Exhibit A hereto and incorporated herein), it is clear that the bonuses to be paid under the Sale Bonus Agreements are in fact retention bonuses. Among other things, there are no performance or sale price targets that need be reached in order for the Debtors' executives (which include insiders) to earn their bonuses. Rather, all that is required is that each executive remain employed by the Debtors at the time of the closing of the sale of the Debtors' assets, or have been terminated without cause within 90 days of such closing. The executives

must also sign a "Sale Bonus Agreement," the purpose of which is explicitly stated on the first page to be, "to provide a financial incentive for certain executives to remain employed by the Company." *See* Ex. B to Bonus Motion, p. 2 (Dkt. No. 86-3, p. 2 of 42).

31. It is also clear that the Debtors cannot establish that they comply with section 503(c) of the Code with respect to bonus payments to their insiders, because they admit in one of their filings that none of the insiders have bona fide job offers from any other business. *See* Bonus Supplement, Dkt. No. 86, ¶ 9. A bona fide job offer is a requirement under § 503(c)(1)(A) for retention bonuses to insider.[5] *See* 11 U.S.C. § 503(c)(1)(A).

32. Knowing that they cannot comply with § 503(c) of the Code, the Debtors have sought evade the specific requirements of that section, by seeking approval of their retention bonus program through two more general sections of the Code. First, the Debtors sought approval of their bonus program though a motion to assume and assign the Sale Bonus Agreements under § 365 of the Code. *See* Bonus Motion, Dkt. No. 86. When both the U.S. Trustee and the Committee filed objections to that motion, the Debtors adjourned it, and filed the Bid Procedures Motion, in which they seek to have those same bonuses paid to those same executives as part of the sale process under § 363 of the Bankruptcy Code.

33. It is black letter law that a party cannot use a more general provision of a statute to avoid the requirements of a more specific provision. This principle was restated by the Supreme Court during the current term in the case of *Law v. Siegel*, --- U.S. ---, 134 S. Ct. 1188 (2014). In discussing the principle that § 105(a) of the Bankruptcy Code may not be used to

---

[5] All three subsections of 503(c)(1) must be met for a retention bonus program to be allowable under the Bankruptcy Code. *In re Mesa Air Group, Inc.*, No. 10-10018, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2012) (*citing* 4 Collier Bankruptcy ¶ 503.17 (15th ed. Rev. 2007); *accord Foothills Texas*, 408 B.R. at 577; *Dana Corp.*, 358 B.R. at 575.

override explicit mandates of the Bankruptcy Code, the Supreme Court noted that it was "simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." 134 S. Ct. at 1194. *See also RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* --- U.S. --- , 132 S. Ct. 2065, 2071 (2012)(where a general permission or prohibition in a statue is contradicted by a specific one, "the specific provision is construed as an exception to the general one.").

34.    This Court's ruling in *In re Foothills of Texas, Inc.*, 408 B.R. 573 (Bankr. Del 2009)(Sontchi, J.), is directly on point. There, the Court denied the debtors' motion to assume employee agreements with officers under § 365 of the Code, and to pay such officers bonuses under § 363(b), holding that, "[a]s the Debtors' sole motivation for filing and prosecuting the motion is to obtain authority to make retention payments that are prohibited by § 503(c)(1) of the Bankruptcy Code, it is not a reasonable exercise of the Debtors' business judgment to assume the agreements and/or make the payments." *Id.* at 584-5.

35.    Also instructive is a recent decision of the Bankruptcy Court of the Southern District of New York, *In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013). There, the Court rejected a plan provision to pay a departing CEO amounts in excess of the § 503(c)(2) severance limits, holding that, under § 1129(a)(1) of the Code, "the Court cannot approve a payment [under a plan] that is clearly prohibited by another, more specific part of the Bankruptcy Code. *Id.* at 696 (citing *RadLAX Gateway Hotel*, 132 S. Ct. 2065 (2012), and *In re Adelphia Communs. Corp.*, 441 B.R. 6, 13, n. 18 (Bankr. S.D.N.Y. 2010)(noting that meeting the requirements of § 503(c) was the *only* method of approving a severance payment to a debtor's insider in the context of a Chapter 11 case).

36. The *AMR* Court further noted that "it is not surprising then that courts disfavor attempts to bypass the requirements of § 503(c) given the history and intent of the section." 497 B.R. at 696. The history referenced by the Court is that § 503(c) was added to the Bankruptcy Code in 2005 as a part of the BAPCPA amendments, to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *Id., quoting In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012)(*citing In re Global Home Prods., LLC,* 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)).

37. Under the above-referenced authority, the Debtors may not avoid the requirements of § 503(c) by requiring that parties interested in bidding on their assets to agree to take assignment of the Sale Bonus Agreements, and pay the Debtors' executives over $1 million. Having the buyer of the Debtors' assets pay bonuses to the Debtors' executives, which are then deducted, dollar for dollar, from the sale proceeds going to the Debtors' estates, is identical to having the Debtor pay those bonuses themselves, without complying with§ 503(c). The Debtors' Bid Procedures Motion must therefore be denied.

***The Bid Procedures Cannot Be Approved Because They Will Chill Bidding***

38. The Debtors' Bid Procedures Motion also must be denied because the bid procedures will chill, rather than encourage, bidding. First, the Debtors have taken what is actually a $5.5 million bid (which is the amount that will be paid to the Debtors' estates) and are calling it a $6.5 million bid. There may be potential bidders who not want to hire any of the Debtors' employees, and place no value on the sale bonus agreements, or who believe they can negotiate a lower payment to entice such executives to work for them. If the stalking horse bid was stated to be $5.5 million, and if there were no requirements that bidders agree to take assignment of the Sale Bonus Agreements, there might be bidders willing to bid $5.5 mil, plus

the initial overbid. However, such bidders may not be willing to bid $6.5 million plus the overbid, as is currently required, and thus may make no bid at all under the current bid procedures. A bid of $5.5 mil, plus the initial overbid, would in fact be a higher and better offer than that of the Stalking Horse, as it would increase the amount of money actually going to the Debtors. But the Debtors might never learn of such potential bid due to the way their bidding procedures are constructed. Or if the Debtors do learn of it, they may reject it because it does not comply with their requirement that all bidders agree to be bound by the Sale Bonus Agreements.

39. The requirement that all bidders must take assignment of the Sale Bonus Agreements may further chill bidding because some bidders may be reluctant to agree to the requirement that they make bonus payments to the Debtors' executives even if the Court denies the Bonus Motion. Bidders would be reasonable to be concerned that making such payments could render them in violation of a Court order.

40. Nor is it even clear that the Stalking Horse is the highest bidder at this point in time. It is not known whether the Debtors to date have told all potential bidders that they are required to take assignment of the Sale Bonus Agreements. If so, bidding has already been chilled, and the entire bid process has been corrupted. Even if the Debtors did not tell all potential bidders that they had to agree to assignment of such agreements, it is unknown whether the Debtors considered any bids that did not incorporate such assignments, and if they did, how they valued such bids in comparison to that of the Stalking Horse.

41. Debtors may argue, as they did in their Bonus Motion, that the non-compete, non-disclosure and non-solicitation provisions of the Sale Bonus Agreement will make

the Debtors more attractive to potential purchasers. However, this argument ignores the following:

> (a) The Debtors have conceded that their executives who are eligible for bonuses are already bound by non-compete, non-disclosure and non-solicitation provisions in their original employment contract, although the Debtors assert their belief that the provisions in the Sale Bonus Agreements will be easier to enforce than those in the original employment agreements. *See* Bonus Motion, Dkt. 86, ¶12; Omnibus Reply, Dkt. 184, ¶ 11.
>
> (b) Each of the Debtors' executives retains the right to prevent assignment of their Sale Bonus Agreement to the purchaser of the Debtors' assets up until the time of the sale hearing. *See* Bonus Motion, ¶ 30. It is hard to imagine a potential purchaser giving much value to non-compete, non-disclosure and non-solicitation provisions in contracts that can be disavowed by the Debtors' executives *after* that potential purchaser has made a binding bid.[6]

42.   Moreover, if, as the Debtors say, the extra non-compete, non-disclosure and non-solicitation provisions of the Sale Bonus Agreement make the Debtors more attractive to potential bidders, then the Debtors would not have to force all bidders to agree to take assignment of such agreements, as they do through the bid procedures. Nor would there be any need to reduce from the proceeds of the sale such bonus payments, as the bid procedures also propose.

---

[6]   It is not clear in that instance whether the money the buyer would have paid to the disavowing executive would be paid to the Debtors, or reduced from the purchase price.

***The Break-Up Fee is Not Entitled to Superpriority Administrative Claim Status,
and Should be Based on a Percentage of the Proceeds that Will Actually Be Paid to the
Debtors, Not What Will be Paid in Bonuses to the Debtors' Executives***

43. The U.S. Trustee also objects to a provision in the proposed bid procedures order that gives the break-up fee superpriority administrative expense status. While the Break-Up Fee is entitled to be treated as an administrative claim, it is not entitled to superpriority treatment because it does not fall under either of the two situations in which the Bankruptcy Code allows such treatment: (a) to a party providing post-petition financing, and (b) to a secured party for the purposes of providing adequate protection for any diminution in value of their collateral caused by the use of such collateral during the course of the Chapter 11 cases. *See* 11 U.S.C. §§ 361(2), 364(c)(1) and 507 (b).

44. In addition, the break-up fee is $ 195,000 is 3% of the $6.5 million Stalking Horse bid. However, over $1 million of the $6.5 million is not going to be paid to the Debtors' estates, but rather is to be paid in bonuses to the Debtors' executives. Therefore, the break-up fee should be based on 3% of approximately $5.5 million, which is approximately $165,000.

## **CONCLUSION**

45. In sum, the Bid Procedures will chill, rather than encourage, bidding, and appear to have been designed not with the goal of obtaining the highest and best offer for the Debtors' assets, but rather with the goal of circumventing any negative ruling the Court may make on the Debtors' Bonus Motion as well as the requirements of § 503(c) of the Bankruptcy Code. The Bid Procedures therefore have not been proposed in good faith, and the Bid Procedures Motion should be denied.

**RESERVATION**

46. The U.S. Trustee reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection, file an appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE,** for the reasons stated above, the United States respectfully requests that this Court deny the Bid Procedures Motion, and/or grant such other and further relief as this Court deems appropriate, fair and just.

Dated: April 29, 2014
      Wilmington, Delaware

Respectfully submitted,

**ROBERTA A. DeANGELIS**
**UNITED STATES TRUSTEE**

By: */s/ Juliet Sarkessian.*
    Juliet Sarkessian
    Trial Attorney
    United States Department of Justice
    Office of the United States Trustee
    J. Caleb Boggs Federal Building
    844 King Street, Suite 2207, Lockbox 35
    Wilmington, DE 19801
    (302) 573-6491 (Phone)
    (302) 573-6497 (Fax)
    Juliet.M.Sarkessian@usdoj.gov