IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EDGENET, INC., *et al.*[1] | : | Case No. 14-10066 (BLS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Related to: Docket No. 233 |
| | : | |

**DEBTORS' OMNIBUS OBJECTION TO (I) THE EMERGENCY MOTION
FOR EXTENSION OF BID DEADLINE AND AUCTION DATE CONTAINED IN
SALES PROCEDURES ORDER; (II) THE JOINDER FILED BY THE OFFICIAL
COMMITTEE OF NOTEHOLDERS; AND (III) THE JOINDER BY ERNEST WU**

Edgenet, Inc. and Edgenet Holding Corporation, Debtors and Debtors-in-Possession (the "***Debtors***"), by and through their undersigned counsel, submit this Omnibus Objection to the Emergency Motion for the Extension of Bid Deadline and Auction Date Contained in Sale Procedures Order (the "***Motion***") [D.I. 252], filed by EdgeAQ, LLC ("***Movant***"), the Joinder thereto filed by the official committee of note holders (the "***Committee***") [D.I. 258] and the Joinder filed by Ernest Wu [D.I. 261], which Motion seeks a two week extension of the bid deadline and auction and sale hearing dates and in support thereof, hereby aver as follows:

**Background**

1.   On or about January 14, 2014 (the "***Petition Date***"), the Debtors initiated these bankruptcy proceedings by the filing of their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").

2.   On or about March 19, 2014, the office of the United States Trustee (the "***United States Trustee***") appointed the Committee.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number are Edgenet, Inc. (4977) and Edgenet Holding Corporation (4146).  The address of the Debtors' corporate headquarters is 8 Piedmont Center, 3525 Piedmont Drive, Suite 420, Atlanta, GA 30305

PHIL1 3650695v.4

3. Since the very beginning of these bankruptcy proceedings, the Debtors have made clear their intention to sell their assets through an auction to the highest and best bidder (indeed, this was clearly expressed in the First Day Declaration of Juliet Reising [D.I. 2], which is incorporated herein by reference).

4. Towards that end, on April 11, 2014, the Debtors filed their Motion for an Order (A) Approving Sale Procedures and Bidding Protections in Connection with Sale of the Debtors' Assets Pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of the Debtors' Assets; (C) Approving Notice of Respect Dates, Times, and Places for Auction and for Hearing on Approval of Asset Purchase Agreement and Sale of the Debtors' Assets, and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Establishing Procedures for Noticing and Determining Cure Amounts; and (E) Granting Other Relief [D.I. 199] (the "***Procedures Motion***") as well as their Motion for Order (A) Authorizing and Approving Asset Purchase Agreement; (B) Approving, Subject to Higher or Better Offers, Sale of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code Free and Clear of all Liens, Claims Encumbrances and Interests; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Authorizing the Debtors to Consummate Transactions Related to the Above; and (E) Granting Other Relief [D.I. 197] (the "***Sale Motion***").

5. The hearing on the Procedures Motion was held on May 4, 2014, and the order approving the Procedures Motion and setting the sale procedures (the "***Sale Procedures Order***") was subsequently entered on May 5, 2014 [D.I. 233].

6. Both the Committee and the United States Trustee objected to the sale procedures as set forth in the Procedures Motion, but it is noteworthy that neither objected to the timing of the process, including the length of time from the hearing on the Sale Procedures until the hearing on the Sale Motion (the "**Sale Hearing**"), the date for submitting Qualified Bids[2], the date of the Auction or any other dates of importance as set forth in the Procedures Motion. Ultimately, the objections of the both the United States Trustee and the Committee to the Procedures Motion were resolved and the Sale Procedures Order was entered. It is clear that all concerned recognized the best way to maximize value was for the sale process to move forward promptly.

7. In accordance with the Sale Procedures Order, a copy of the Sale Procedures Order as well as the Sale Motion and the Sale Procedures themselves were timely and properly served. Included in the list of those served were two of the principals of Movant, Steven Proctor and JJ Frietag [D.I. 233].

8. As set forth more fully below, the Debtors and their financial advisor, JMP Securities, LLC ("**JMP**"), the entity running the sale process (as it has been doing since hired by the Debtors in February of 2013), have made every effort to maximize the sale proceeds for the benefit of all constituencies and have assiduously adhered to the rules of the sale process as set forth in the Sale Procedures Order and in the Sale Procedures, except, as set forth below, when it allowed Movant access to the due diligence materials, including interviews, beyond those in the Data Room, notwithstanding that Movant likely did not meet the necessary requirement to be allowed to do so.

9. On May 29, 2014, Movant filed the Motion seeking to delay the sale ostensibly blaming the Debtors, JMP and the Court ordered process itself, for the Movant's own inability to

---

[2] Capitalized terms used, but not defined herein, have the meanings set forth in the Procedures Motion.

obtain financing. It seems that the Movant places blame everywhere except where the blame should be focused-on the Movant and its principals. The process has been fair (and in the case of the Movant, as set forth below, overly fair) and designed to maximize value. The process has run its course and now it is time to allow the process to be completed through the auction and sale as scheduled.

### The Objection

10. This Court found the Debtors' proposed sale process to be in the best interests of creditors, and ordered the Debtors to comply with it. The Debtors have done so. To change the sale process now is unjustified and such further delay will only expose the Debtors, their estates and their creditors to unwarranted risk of harm. On the other hand, the Movant, which is not a creditor or party in interest in these proceedings, has nothing to lose. If it never makes a Qualified Bid, It has no deposit to forfeit. It has no claim recovery to be imperiled if the stalking horse purchaser (the "*Stalking Horse*") walks. The Movant is simply looking for a free two week option to conduct additional due diligence and possibly secure a qualified funding source. In the meantime, Debtors' business could suffer, employees depart and the Stalking Horse could declare a breach and seek to walk away.

11. The simple fact is the Movant, despite knowing about the sale of the Debtors' assets for months, has not been able to obtain financing. The assertions regarding the Debtors' or JMP's alleged failings are nothing more than a smoke screen to try to obscure their true intent, which is to attempt to gain more time to find the funds to close.

12. As an initial matter, under the terms of the purchase agreement, as amended, between the Debtors and Stalking Horse (the "*Purchase Agreement*"), the Debtors are precluded from agreeing to continue the deadlines as requested in the Motion. That act alone

would be a breach by the Debtors under the Purchase Agreement and provide the Stalking Horse the right to walk away from the transaction.

13.     Further, as set forth above, the Debtors have abided by the sale process established through the ordinary channels: the Debtors filed their Procedures Motion and, after negotiations with the United States Trustee and the Committee, and making various changes to the procedures (none, we reiterate, relating to the timing of the process) a consensual order was entered. The Debtors and their professionals followed the rules as established by the Procedures Order and the Sale Procedures and there is no reason to vary the procedures now.

14.     The Debtors' operations are in a precarious state and the need to continue on the current path is real.  In May alone, three employees gave their notice to leave.  The Stalking Horse is not yet tethered inextricably to this transaction and is very concerned about the ongoing deterioration of the Debtors' operations, including the loss of employees, continued customer uncertainty and loss of business.  If additional personnel leave, the Debtors are gravely concerned not only with the integrity of their ongoing operations, but also with the possibility of putting the Stalking Horse transaction (and the interest of any other potential purchasers) at significant risk. It is easy and self-serving for the non-creditor Movant to suppose facts and make broad statements about how the Debtors will not be harmed by the delay sought in the Motion; however, among those running the business, there is serious concern about the ongoing viability of the Debtors' operations should this process be prolonged.  Every day adds more risk to the proposed sale collapsing.  That may be exactly the Movant's strategy, to let the Debtors' operations slip enough to drive the Stalking Horse and any other currently viable purchasers away, thereby causing a reduction in the purchase price to the point where the Movant will

actually be able to raise sufficient funds to make the purchase. Such strategy, however, is not in the best interest of the Debtors, their estates or their creditors.

15. The Movant states that since the closing date is not until June 30, there will be no harm to the Debtors, their estates or creditors by allowing the requested delay. The Purchase Agreement sets June 30 as the outside closing date. Unfortunately, Movant is incorrect. The Stalking Horse has made it clear that given its concerns about the eroding operations of the Debtors that it intends to close as soon as possible after the order approving the sale is entered, assuming it is the successful bidder. Under the Purchase Agreement, given that the Debtors are keeping their cash, and their ongoing operations are losing cash over time, the Debtors estimate that requested two week delay will reduce the Debtors cash position by approximately $500,000. This is an absolute loss to the estates and the creditors.

16. The assertions in the Motion are not the full story of the process. Without detailing all of the missing information and clear mistakes in the Movant's recounting of the process (such will be detailed at the hearing through testimony), it should be noted that Movant's problems are tied to Movant's own failure to obtain timely and adequate NDA's as well as Movant's delay in seeking specific information from JMP outside of the Data Room.

17. What is most telling in Movant's recitation in the Motion is what is missing. The Movant asserts as significant that it did not get the Purchase Agreement and its Schedules until May 13 and that the Purchase Agreement and the Schedules did not reflect the change in the purchase price as dictated by the amendment. What the Movant fails to mention is that the Purchase Agreement was filed with the Sale Motion and has been in the public domain since April 11, 2014, that the amendment to the Purchase Agreement (the "*Amendment*") was filed on May 8, 2014 and has been in the public domain since such time, or that the Amendment is not a

restatement of the entire Purchase Agreement, but is merely a document which sets forth the small handful of changes to the Purchase Agreement, including which Schedules are no longer applicable and that the purchase price had been reduced, among other things. Further, the Movant fails to set forth that the Schedules to the Purchase Agreement were not part of the Data Room due to the sensitivity of their information, and that the Sale Procedures (duly served upon two principals of Movant) in section I, states "To obtain access to additional due diligence beyond the data room information, an Interested Party must provide evidence of the Interested Party's source of capital or other financial ability to complete the contemplated transactions". Also missing from the Movant's litany of assertions is that the Movant did not provide any such financial information to JMP until May 12, when it was promptly allowed access to additional due diligence, such as the Schedules to the Purchase Agreement, which it then received on May 13.

18.     The "financial information" provided by Movant to allow it to proceed to diligence beyond the Data Room was hardly what would be considered "evidence" of Movant's source of funding, as the information provided made clear that none of the three funding sources provided by the Movant were actually committed to funding the Movant's intended purchase. Nonetheless, the Debtors, in consultation with JMP, agreed to allow Movant access to due diligence beyond the Data Room. It is also notable that the current "funding source" for Movant, Tenth Street Capital (presumably the "principal financer" referenced by the Movant), was not even on the list presented as the Movant's "funding sources" on May 12. Movant has in fact presented five different potential funding sources to JMP in this process.

19.     Movant also neglects to mention that its current "funding source", Tenth Street Capital was not entitled to receive any diligence information whatsoever, until May 22 because it

was not until May 22 that Tenth Street Capital executed the necessary NDA, as required by the Sale Procedures. Of course, any financing by Tenth Street Capital or otherwise will have to be sufficient to satisfy the requirement that Movant can close the transaction under any bid it makes.

20. In the motion seeking shortened notice ("**Notice Motion**") that was filed with the Motion, the Movant states that "until recently, [Movant] was not even aware of the Debtors' sale process." This, too, is simply untrue. As stated previously and by the Movant's own admissions, the Movant's principals had been in discussion with the Debtors and JMP as early as January and February of 2014. The Debtors' motions seeking approval of the sale and bid procedures were filed on April 11, 2014 and served on the Movant's principals. On April 15, 2014, Mr. Proctor (a principal of the Movant) informed JMP by e-mail "[w]e plan to submit a bid in the next 24-48 hours." That, of course, never happened, as no bid was forthcoming. These facts are in direct contradiction with the Movant's representations.

21. As set forth previously, the above recitation of inaccurate and incomplete information set forth in Movant's Motion is but a sample of facts missing from the full story and, at the hearing, the Debtors will present testimony on these and additional inaccurate and incomplete information.

22. Furthermore, as mentioned above, the Stalking Horse is not fully obligated at this point to complete a sale. As confident as the Movant is that no "walk rights" would be triggered by the extensions Movant seeks, the Debtors submit that there is real risk that the Stalking Horse may walk away from the deal, which could have no effect other than to significantly drive down the purchase price, all to the detriment of the Debtors, their estates and their creditors. Movants do nothing to mitigate that risk.

23. The Debtors and their professionals have complied with the Court-approved and ordered sale process. The Debtors have been and continue to be responsive to Movant at every step of the process (customer calls with Movant are scheduled for today). The Debtors, their estates and creditors should not be put in jeopardy because Movant simply cannot obtain financing. It is because of Movant's own delay and the delay of its potential funding sources that it is in the position in which it now finds itself.

WHEREFORE, for the reasons set forth above, Debtors request the Court to enter an Order denying the Motion.

| | |
|---|---|
| Dated: May 30, 2014<br>Wilmington, Delaware | */s/ Raymond H. Lemisch*<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Raymond H. Lemisch (DE Bar No. 4204)<br>Margaret M. Manning (DE Bar No. 4183)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 N. Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:   (302) 426-1189<br>Facsimile:    (302) 426-9193<br><br>- and -<br><br>Morton Branzburg, Esquire<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>1835 Market Street, Suite 1400<br>Philadelphia, Pennsylvania 19103<br>Telephone:   (215) 569-2700<br>Facsimile:    (215) 568-6603<br><br>*Counsel to the Debtors and Debtors in Possession* |