# EXHIBIT A

**Execution Version**

ASSET PURCHASE AGREEMENT

Between

EDGENET, INC.,

EDGENET HOLDING CORPORATION

And

EDGEAQ, LLC

Dated June 6, 2014

**Execution Version**

# TABLE OF CONTENTS

ARTICLE I  BASIC TRANSACTION ................................................................................1

    1.01  Purchase and Sale of Assets.................................................................1
    1.02  Excluded Assets..................................................................................3
    1.03  Assumption of Liabilities....................................................................4
    1.04  Assumed Contracts .............................................................................5
    1.05  Excluded Liabilities ...........................................................................6
    1.06  Purchase Price ....................................................................................7
    1.07  Deposit  ...............................................................................................7
    1.08  Allocation of the Purchase Price and Assumed Liabilities................7
    1.09  Acquired Assets sold "As Is, Where Is" ............................................8

ARTICLE II  CLOSING OF THE TRANSACTION ........................................................9

    2.01  The Closing.........................................................................................9
    2.02  Deliveries at the Closing....................................................................9
    2.03  Prorations .........................................................................................10
    2.04  Termination of Agreement................................................................10
    2.05  Effect of Termination.......................................................................11
    2.06  Remedies...........................................................................................11
    2.07  Survival  ............................................................................................12

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLER......................12

    3.01  Organization and Corporate Power...................................................12
    3.02  Authorization ....................................................................................12
    3.03  No Violation .....................................................................................12
    3.04  Title to Properties.............................................................................13
    3.05  Tax Matters ......................................................................................13
    3.06  Contracts and Commitments.............................................................13
    3.07  Intellectual Property.........................................................................14
    3.08  Litigation; Compliance; Permits......................................................16
    3.09  Brokerage..........................................................................................16
    3.10  Governmental Consent, etc...............................................................16
    3.11  Insurance ..........................................................................................17
    3.12  Affiliated Transactions .....................................................................17
    3.13  Financial Statements.........................................................................17
    3.14  Customers and Suppliers ..................................................................17
    3.15  Absence of Developments ................................................................17
    3.16  No Other Representations or Warranties; Schedules........................18

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF BUYER........................18

    4.01  Organization and Corporate Power...................................................18
    4.02  Authorization ....................................................................................18
    4.03  No Violation .....................................................................................19
    4.04  Governmental Authorities; Consents................................................19

i

**Execution Version**

4.05  Litigation........................................................................................................19
4.06  Brokerage.......................................................................................................19
4.07  Solvency .........................................................................................................19
4.08  Adequate Assurance .....................................................................................19
4.09  Financial Capability ......................................................................................19
4.10  OFAC ..............................................................................................................20

**ARTICLE V  BANKRUPTCY COURT MATTERS** ..........................................................20

5.01  Bankruptcy Court Approval of Bid Procedures..........................................20
5.02  Bankruptcy Court Approval of Sale ...........................................................20
5.03  [Intentionally deleted.].................................................................................20
5.04  Efforts of Seller.............................................................................................20
5.05  Timing ............................................................................................................20
5.06  Review of Pleadings .....................................................................................20
5.07  Avoidance Actions.........................................................................................21

**ARTICLE VI  PRE-CLOSING COVENANTS** ............................................................21

6.01  Access to Information....................................................................................21
6.02  Confidential Information ..............................................................................21
6.03  Employees......................................................................................................21
6.04  Supplements to Schedules ...........................................................................22
6.05  Conduct of Business .....................................................................................22

**ARTICLE VII  OTHER COVENANTS** ....................................................................22

7.01  Participation and Service Credit ..................................................................22
7.02  Preservation of Records; Cooperation .......................................................23
7.03  Certain Taxes .................................................................................................23
7.04  Further Assurances ........................................................................................24
7.05  Name Change.................................................................................................24
7.06  Seller Confidentiality....................................................................................25
7.07  Non-Assignment of Contracts .....................................................................25
7.08  Other Bids...................................................**Error! Bookmark not defined.**

**ARTICLE VIII  CONDITIONS TO CLOSING** ..........................................................25

8.01  Conditions Precedent to Obligations of Buyer ..........................................25
8.02  Conditions Precedent to Obligations of Seller...........................................26
8.03  Conditions Precedent to Obligations of Buyer and Seller ........................27
8.04  Frustration of Closing Conditions...............................................................27

**ARTICLE IX  LIMITATIONS** ...............................................................................27

9.01  Buyer's Review..............................................................................................27
9.02  No Consequential or Punitive Damages .....................................................28

**ARTICLE X  DEFINITIONS** .................................................................................28

10.01  Definitions ...................................................................................................28
10.02  Knowledge Defined .....................................................................................35

ii

ARTICLE XI MISCELLANEOUS ...................................................................................................35
   11.01  Press Releases and Communications .................................................................35
   11.02  Expenses .............................................................................................................36
   11.03  Notices ................................................................................................................36
   11.04  Successors and Assigns ......................................................................................37
   11.05  Severability .........................................................................................................37
   11.06  Descriptive Headings; Interpretation; Disclosure Generally ............................38
   11.07  Construction ........................................................................................................38
   11.08  Complete Agreement ..........................................................................................38
   11.09  Counterparts; Delivery by Facsimile or PDF ....................................................38
   11.10  Governing Law ...................................................................................................39
   11.11  Submission to Jurisdiction .................................................................................39
   11.12  No Right of Set-Off ............................................................................................39
   11.13  WAIVER OF JURY TRIAL ...............................................................................40
   11.14  Bulk Transfer Laws ............................................................................................40
   11.15  Amendments and Waivers ..................................................................................40
   11.16  No Third Party Beneficiary .................................................................................41
   11.17  Prevailing Party ..................................................................................................41
   11.18  Non-Recourse .....................................................................................................41
   11.19  Guaranty of Buyer Obligations ..........................................................................41

<u>List of Exhibits</u>

| | |
|---|---|
| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Form of Trademark Assignment |
| Exhibit E | Form of Copyright Assignment |
| Exhibit F | Form of Domain Name Assignment |
| Exhibit G | Form of Lease Assignment |
| Exhibit H | Form of Approval Order |
| Exhibit I | Form of Procedures Order |
| Exhibit J | Form of Counterparty Consent |
| Exhibit K | Form of Patent Assignment |

<u>List of Schedules</u>

Acquired Assets Schedule (§ 1.01)
Cash Escrow Schedule (§ 1.02)
Assumed Liabilities Schedule (§ 1.03)
Sale Bonus Agreements Schedule (§ 1.04(d))
Allocation Schedule (§ 1.08)
Foreign Qualification Schedule (§ 3.01(a))
Authorization Schedule (§ 3.03)
Leased Real Property Schedule (§ 3.04(a))
Liens Schedule (§ 3.04(d))
Taxes Schedule (§ 3.05)

**Execution Version**

Contracts Schedule (§ 3.06)
Intellectual Property Schedule (§ 3.07)
Litigation Schedule; Permit Schedule (§ 3.08)
Governmental Consents Schedule (§ 3.10)
Insurance Schedule (§ 3.11)
Affiliated Transactions Schedule (§ 3.12)
Financial Statement Schedule (§ 3.13)
Customers and Suppliers Schedule (§ 3.14)
Developments Schedule (§ 3.15)
Avoidance Actions Schedule (§ 5.07)
Employees Schedule (§ 6.03)

iv

**Execution Version**

## ASSET PURCHASE AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into as of June 6, 2014, between EDGEAQ, LLC, a Tennessee limited liability company, or its permitted assigns ("Buyer"), EDGENET, INC., a Delaware corporation ("Edgenet"), and EDGENET HOLDING CORPORATION, a Delaware corporation ("Holding" and together with Edgenet, "Seller"). Buyer and Seller are referred to collectively herein as the "Parties," and other capitalized terms used herein and not otherwise defined are defined in ARTICLE X below.

Seller is engaged in the business of providing cloud based content, applications and services that enable customers to sell more products and services with greater ease across multiple channels and devices (the "Business").

On January 14, 2014 (the "Petition Date"), Seller filed petitions for protection from its creditors under Chapter 11 of Title 11, United States Code (as amended from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"; the bankruptcy case of Seller is identified as Bankruptcy Case No. 14-10066 and is hereinafter referred to as the "Chapter 11 Case").

Subject to the terms and conditions set forth in this Agreement, Seller desires to sell to Buyer, and Buyer desires to acquire from Seller, substantially all of the assets of Seller used in the Business, and Seller desires to assign to Buyer, and Buyer desires to assume from Seller, only those certain liabilities of Seller relating to the Business explicitly listed herein as Assumed Liabilities.

The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to an Approval Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## BASIC TRANSACTION

1.01    **Purchase and Sale of Assets.**  On and subject to the terms and conditions of this Agreement, at the Closing (as hereinafter defined), Buyer shall purchase from Seller, and Seller shall sell, transfer, convey and deliver to Buyer, all right, title and interest of Seller in and to the assets and property of Seller, including those set forth on the Acquired Assets Schedule attached hereto free and clear of all Liens and Liabilities (except Permitted Liens and the Assumed Liabilities) pursuant to sections 105, 363 and 365 of the Bankruptcy Code (collectively, the "Acquired Assets"), but excluding the Excluded Assets, including the following assets of Seller:

(a)    all accounts, notes and other receivables, including those set forth on part 1.01(a) of the Acquired Assets Schedule;

Execution Version

(b)    all leasehold and other interests in real property set forth on part 1.01(b) of the Acquired Assets Schedule;

(c)    (i) all fixed assets, equipment, spare parts, machinery, furniture, fixtures, tools, computers, servers, telephone systems, furniture, leasehold improvements and supplies, and other personal property wherever located and any related rights thereto (the "Equipment"); and (ii) any and all rights of Seller, to the extent transferable, to the warranties and licenses received from manufacturers and sellers of the Equipment (if any), including those set forth on part 1.01(c) of the Acquired Assets Schedule;

(d)    all Intellectual Property owned by Seller, including, but not limited to the Intellectual Property set forth on part 1.01(d) of the Acquired Assets Schedule (the "Seller Owned Intellectual Property");

(e)    all Contracts set forth on part 1.01(e) of the Acquired Assets Schedule (collectively with the Contracts set forth on part 1.01(b) of the Acquired Assets Schedule, the "Assumed Contracts");

(f)    all Permits and similar rights obtained from Government Authorities, to the extent assignable;

(g)    all Business Records (except to the extent included in the Excluded Assets);

(h)    all rights to and goodwill and other intangible assets represented by the name "Edgenet" or any other names used by Seller or the Business and any logos related thereto and associated with the Acquired Assets, including customer and supplier lists;

(i)    subject to Section 2.03 below, all surety accounts, prepaid expenses, refunds, security and like deposits, and other similar prepaid items relating to any Acquired Assets or Assumed Liabilities;

(j)    any and all rights of set-off of Seller arising out of or relating to events prior to the Closing Date (except to the extent relating to the Excluded Liabilities);

(k)    any and all computer applications, software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage and all computer operating, security or programming software, owned or licensed by Seller, to the extent assignable with respect to any licensed applications or software;

(l)    all telephone numbers, fax numbers, email addresses, and internet domain names;

(m)    all rights, remedies and benefits of Seller arising under or relating to any of the Acquired Assets or the Assumed Liabilities, including rights, remedies and benefits arising out of express or implied warranties and services agreements from manufacturers or suppliers of

2

Execution Version

the Equipment (or components thereof), the other Acquired Assets or products purchased or ordered by Seller prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(n)    all rights of Seller under non-disclosure or confidentiality, non-compete, assignment of intellectual property rights (inventions), acknowledgements of work-for-hire or non-solicitation agreements with employees, consultants, independent contractors and agents of Seller or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the sale of the Business, in each case to the extent assignable;

(o)    the PayPal Funds, provided that the Purchase Price shall be increased dollar for dollar on the Closing Date by the amount of the PayPal Funds acquired by Buyer (which, for the avoidance of doubt, at Closing such PayPal Funds shall remain on deposit with PayPal for the benefit of Buyer);

(p)    the short-term disability, long-term disability, life insurance, health, dental, vision, and 401(k) plans of Seller set forth on part 1.01(p) of the Acquired Assets Schedule (the "Assumed Plans");

(q)    all other assets of Seller of every nature, kind and description, tangible and intangible, owned or leased or licensed, wherever located, other than Contracts that are not Assumed Contracts and the Excluded Assets.

1.02    Excluded Assets. Notwithstanding anything else herein or in any document or instrument delivered pursuant hereto, the Acquired Assets shall not include any of the assets and property of Seller described in this Section 1.02 (the "Excluded Assets"), none of which shall be conveyed to Buyer:

(a)    Seller's insurance policies and any prepaid premiums with respect thereto to the extent such policies cover any Excluded Liabilities;

(b)    Seller's corporate charter and bylaws, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance, and existence of Seller as a corporation;

(c)    all claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment with respect to any Excluded Assets (including, without limitation, with respect to insurance policies and Taxes relating to Seller's income);

(d)    all cash and cash equivalents other than (x) cash representing payment of the Special Receivables described in Section 1.10 to the extent such Special Receivables are paid prior to Closing, and, (y) to the extent not constituting accounts receivable, prepaid expenses (subject to Section 2.03), or PayPal Funds, all "restricted cash" consisting of certificates of

3

Execution Version

deposit pledged by Seller to secure credit card obligations and all "cash reserves" held by credit card and/or or payment processors and any and all cash escrows funded by Seller for utilities, including, without limitation, the deposits and cash escrows described on Schedule 1.02(d) attached hereto;

(e)    the sponsorship of and assets maintained pursuant to or in connection with any Plan (other than pursuant to or in connection with an Assumed Plan) of Seller or any of its Affiliates;

(f)    all rights of Seller arising under this Agreement and under any other agreement between Buyer and Seller entered into in connection with this Agreement;

(g)    the Excluded Contracts and any Contract terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business;

(h)    all preference or avoidance claims and actions of Seller including any such claims and actions arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (the "Avoidance Actions");

(i)    all deposits with respect to legal, accounting, financial advisory, valuation and investment banking fees and expenses incurred by or on behalf of Seller or its Affiliates;

(j)    any (i) confidential personnel and medical records pertaining to any employee of Seller; (ii) books or records that Seller is required by Law to retain or that relate to the Excluded Assets or Excluded Liabilities; and (iii) Tax Returns, financial statements, and corporate or other entity filings and all related documents; provided, however, that Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Acquired Assets or Assumed Liabilities; and

(k)    any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date.

1.03    Assumption of Liabilities.  On and subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume the Seller's liabilities and obligations expressly set forth below (the "Assumed Liabilities") and no other Liabilities of the Seller or its Affiliates:

(a)    all accounts payable as of the Closing Date that are current and arose post-petition in the ordinary course of business consistent with past practice (a listing of the current, post-petition accounts payable as of the date indicated are set forth on part 1.03(a) of the Assumed Liabilities Schedule, to be updated no later than two (2) Business Day's prior to Closing);

(b)    the liabilities assumed pursuant to Section 6.03 ("Employees");

(c)    all obligations and liabilities under the Assumed Contracts first arising after the Closing;

4

Execution Version

(d)    all obligations and liabilities for ordinary course refunds, advertising, coupons, adjustments, allowances, repairs, exchanges, returns and warranty, merchantability and similar claims relating to or arising in the ordinary course from the Business first arising after the Closing;

(e)    all liabilities and obligations for (i) one-half the aggregate amount of Transfer Taxes payable under Section 7.03(a) below and (ii) Taxes related to the Acquired Assets for periods (or portions thereof) beginning on the day after the Closing Date, in accordance with Section 7.03 below;

(f)    all obligations and liabilities of Seller set forth on the Assumed Liabilities Schedule first arising after the Closing; and

(g)    all liabilities under any Assumed Plan maintained by Seller.

1.04    Assumed Contracts.

(a)    At the Closing and pursuant to section 365 of the Bankruptcy Code and the Approval Order, Seller shall assume and assign to Buyer, and Buyer shall consent to such assignment from Seller, the Assumed Contracts. All Cure Costs with respect to the Assumed Contracts shall be paid in full by Seller no later than five (5) Business Days after the later of (i) the Closing Date and (b) the date the Bankruptcy Court enters an order determining the Cure Costs, and Buyer shall have no Liability therefor. Buyer shall be responsible for providing adequate assurance of future performance under the Assumed Contracts in connection with the assumption and assignment thereof by Seller.

(b)    From the date hereof through the Bid Deadline Date, Buyer shall have the right, by written notice to Seller, to either (i) designate any Contract not already so designated to be an Assumed Contract (to the extent that such Contract is still in effect), or (ii) remove any Contract from the Acquired Assets Schedule. The Acquired Assets Schedule shall be amended to include or remove any such Contract as an Assumed Contract. Any Contract not listed on, or initially listed on but subsequently removed by Buyer from, the Acquired Asset Schedule shall not be designated as an Assumed Contract (each, an "Excluded Contract") for all purposes of this Agreement and all liabilities and obligations under such Contract shall be Excluded Liabilities for all purposes of this Agreement. Any such addition or removal does not affect the Purchase Price payable hereunder.

(c)    Seller may in its sole and absolute discretion, subject to applicable Law, assume, assign, or reject any Contract other than an Assumed Contract at any time; provided, however, that in the event Seller intends to do so prior to the Closing Date with respect to any Contract, Seller shall notify Buyer of such intent in writing and Buyer shall have three (3) Business Days to designate such Contract to be an Assumed Contract (even if such designation occurs after the Closing Date). In the event Buyer does not agree in writing to designate such Contract to be an Assumed Contract within said period, Seller may assume, assign, or reject such Contract in its sole and absolute discretion at any time thereafter.

**Execution Version**

1.05    Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement or any of the schedules attached hereto, Buyer shall not assume or be deemed to assume and shall have no responsibility or obligation with respect to, any Liability of, or claim against, Seller, or of any predecessor, stockholder or other Affiliate of Seller, of any kind or nature, whether absolute, accrued, contingent or otherwise and whether due or to become due and whether or not asserted, and whether or not known or unknown or currently existing or hereafter arising, and however arising for any of the following Liabilities (the "Excluded Liabilities"):

(a)    all Taxes of Seller (other than with respect to 50% of the Transfer Taxes under Section 7.03(a) below);

(b)    all Indebtedness;

(c)    all inter-company liabilities between Seller and any of its Affiliates or Subsidiaries;

(d)    all liabilities under any Plan (other than an Assumed Plan) or pension plan maintained by Seller;

(e)    Liabilities or obligations of Seller for all professional fees and expenses for all of its advisors, including, but not limited to, its advisors retained pursuant to any Order of the Bankruptcy Court;

(f)    any administrative expense Claims accruing in the Chapter 11 Case;

(g)    all pre-petition and post-petition Claims as of the Closing Date, including general unsecured Claims, but specifically excluding any items included in clause (a) of Section 1.03;

(h)    all Cure Costs;

(i)    Liabilities or obligations in connection with the Excluded Contracts;

(j)    any Liabilities related to Seller Employees and former Seller Employees except as provided in Section 1.03(b);

(k)    any Liabilities of Seller that any Person seeks to impose upon Buyer by virtue of any theory of successor liability or "bulk transfer" laws;

(l)    any Liabilities with respect to any Action or other contingent liabilities of Seller (including any environmental, health or safety matters), whether or not disclosed to Buyer, relating to periods and occurrences ended on, before, or after the Closing Date, including any Actions or other claims or contingent liabilities relating to tort, personal injury and products liability;

6

**Execution Version**

(m)    any Liabilities and obligations of Seller arising under or relating to any notice and other requirements of the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") related to terminations prior to, on, or after the Closing;

(n)    any obligations to provide and any claims made pursuant to any coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and any related administrative costs;

(o)    any obligations and Liabilities of Seller resulting from, caused by or arising out of, or that relate to, directly or indirectly, the conduct of Seller or ownership, lease or license of any properties or assets or any properties or assets previously used by Seller or any predecessor of Seller, or other actions, omissions with respect to the period prior to Closing; and

(p)    any other Liability or obligation not expressly assumed pursuant to Section 1.03.

1.06    **Purchase Price.** Subject to adjustment pursuant to Section 1.01(o) hereof, the aggregate purchase price for the Acquired Assets shall be equal to (i) Seven Million Nine Hundred Eighty Thousand Dollars and No Cents ($7,980,000.00), which such amount shall be payable to Seller at the Closing in immediately available, good funds via wire transfer plus (ii) the assumption of the Assumed Liabilities (the "Purchase Price").

1.07    **Deposit.**

(a)    Simultaneously with the execution and delivery of this Agreement, Buyer has deposited into escrow with First American Title Insurance Company, as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, to be executed contemporaneously with this Agreement, among Seller, Buyer and the Escrow Agent in substantially the form attached hereto as Exhibit A (the "Escrow Agreement"), by wire transfer of immediately available funds, a total amount equal to $500,000 as an earnest good-faith money deposit and security for the performance of Buyer's obligations under this Agreement (the "Deposit"). The Escrow Agreement shall include the provisions set forth in this Section 1.07. Upon receipt of the Deposit, the Escrow Agent shall immediately deposit the Deposit into an interest-bearing account. Interest shall be treated as set forth in the Escrow Agreement. The Escrow Agent's escrow fees and charges shall be paid by Buyer.

(b)    The Parties agree that the Deposit (plus interest accrued thereon) shall (i) be applied as a deposit towards the Purchase Price to be delivered to Seller at Closing as provided in Section 1.06, or (ii) be returned to Buyer or paid to Seller as provided in Section 2.05.

1.08    **Allocation of the Purchase Price and Assumed Liabilities.** The Parties agree to allocate the Purchase Price and Assumed Liabilities among the Acquired Assets in accordance with Code Section 1060. Buyer shall prepare and deliver to Seller an allocation schedule setting forth Buyer's determination of the allocation (the "Allocation Schedule") within sixty (60) days of the Closing Date, which Allocation Schedule shall be subject to the reasonable comments and approval of Seller. The Allocation Schedule shall be prepared in accordance with Code Section

7

Execution Version

1060 and shall be used by the Parties in preparing Form 8594 (Asset Acquisition Statement) for each of Buyer and Seller and all Tax Returns of Buyer and Seller. Buyer and Seller shall each file Form 8594, prepared in accordance with this Section 1.08, with its federal income Tax Return for the tax period in which the Closing occurs. The Parties agree that all allocations made pursuant to this Section 1.08 and Allocation Schedule are binding upon them and upon each of their successors and assigns, and that they will not take any position inconsistent therewith for tax purposes, including in connection with any Tax Return, refund claim, litigation or otherwise, unless and to the extent required to do so pursuant to applicable Law.

1.09    Acquired Assets sold "As Is, Where Is". BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SET FORTH IN THIS AGREEMENT OR THE APPROVAL ORDER, (a) THE ACQUIRED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND (b) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE CONCERNING THE ACQUIRED ASSETS OR THE CONDITION, DESCRIPTION, QUALITY OR USEFULNESS OF THE ACQUIRED ASSETS INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED.

BUYER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER WHO HAS HERETOFORE HAD OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AND AGREEMENTS RELATING TO THE ACQUIRED ASSETS THAT BUYER DEEMED OR DEEMS NECESSARY TO REVIEW, AND HAS CONDUCTED AN INSPECTION, ANALYSIS AND EVALUATION OF THE ACQUIRED ASSETS.

BUYER HAS UNDERTAKEN SUCH INVESTIGATION AS BUYER DEEMED NECESSARY TO MAKE BUYER FULLY AWARE OF THE CONDITION OF THE ACQUIRED ASSETS AS WELL AS ALL FACTS, CIRCUMSTANCES AND INFORMATION WHICH MAY AFFECT THE USE AND OPERATION OF THE ACQUIRED ASSETS AND THE BUSINESS.

THE PROVISIONS OF THIS SECTION 1.09 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

1.10    Special Receivables. Notwithstanding anything to the contrary in this Agreement, if Seller receives payment in respect of the Special Receivables (as defined below), then Seller shall hold such payments in trust for Buyer and deliver such payments to Buyer at Closing. The "Special Receivables" means (i) a receivable from Home Depot Store in the amount of $667,446.91 and (ii) a receivable from Masco Cabinetry LLC in the amount of $30,000.00.

Execution Version

## ARTICLE II
## CLOSING OF THE TRANSACTION

2.01    The Closing.  Subject to the satisfaction of all of the conditions set forth in Section 8.01, Section 8.02 and Section 8.03 (or the waiver thereof by the Party entitled to waive that condition) (the date of such satisfaction or waiver, the "Closing Date"), the closing of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities provided for in Article I (the "Closing") shall take place at 10:00 a.m. (Eastern time) two (2) Business Days thereafter remotely upon the electronic exchange of signatures; provided, however that the parties shall use their commercially reasonable best efforts to close the transaction on June 13, 2014 and provided further that Buyer shall waive any right it may have under the applicable sections of the Bankruptcy Code or Rules that require the expiration of fourteen (14) days after the entry of such Order before consummating the transactions contemplated hereby.  The "Effective Time" means 12:01 a.m.  Eastern Time on the Closing Date; provided that the Closing Date shall not be later than the Outside Date.

2.02    Deliveries at the Closing.  At the Closing:

(a)    Seller shall deliver to Buyer (i) certified copies of the resolutions duly adopted by Seller's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other agreements contemplated hereby, (ii) duly executed copies of (A) a bill of sale in substantially the form attached hereto as Exhibit B (the "Bill of Sale"), (B) an assignment and assumption agreement in substantially the form attached hereto as Exhibit C (the "Assignment and Assumption Agreement"), (C) a trademark assignment in substantially the form attached hereto as Exhibit D (the "Trademark Assignment"), (D) a copyright assignment in substantially the form attached hereto as Exhibit E (the "Copyright Assignment"), (E) a domain name assignment in substantially the form attached hereto as Exhibit F (the "Domain Name Assignment"), (F) an assignment and assumption of leases and related agreements with respect to each lease set forth on the Leased Real Property Schedule that is an Assumed Contract, in substantially the form attached hereto as Exhibit G (the "Lease Assignment"), and (G) a patent assignment in substantially the form attached hereto as Exhibit K (the "Patent Assignment"), (iii) a statement from Seller meeting the requirements of section 1.1445-2(b) of the Treasury Regulations, to the effect that Seller is not a "foreign person" within the meaning of section 1445 of the Code and the Treasury Regulations thereunder, (iv) a copy of the Approval Order, (v) such other documents as Buyer's counsel may reasonably request that are necessary to evidence or consummate the Transactions and (vi) the certificates or documents to be delivered pursuant to Sections 8.01(a) and 8.01(b); and

(b)    Buyer shall deliver to Seller (i) an amount equal to the Purchase Price (less the Deposit (plus interest thereon), which Buyer shall cause the Escrow Agent to deliver to Seller at Closing via wire transfer in immediately available, good funds), (ii) certified copies of the resolutions duly adopted by Buyer's members authorizing the execution, delivery and performance of this Agreement and each of the other agreements contemplated hereby, (iii) duly executed copies of the Assignment and Assumption Agreement, the Trademark Assignment, the Copyright Assignment, the Domain Name Assignment, the Lease Assignment and the Patent Assignment, (iv) such other documents as Seller's counsel may reasonably request that are

9

**Execution Version**

necessary to evidence or consummate the Transactions and (v) the certificates or documents to be delivered pursuant to Sections 8.02(a) and 8.02(b).

2.03    Prorations. All expenses (other than expenses constituting Excluded Liabilities) (A) due and payable at times after the Effective Time for periods prior to the Effective Time or (B) paid prior to the Effective Time for periods following the Effective Time, including utility payments, payments due in respect of rents, real and personal property taxes and similar expenses shall be prorated between Seller and Buyer at Closing as of the Effective Time and adjusted through the Purchase Price pursuant to customary and standard procedures for such adjustments. Seller shall provide Buyer with a schedule of such expenses at least one (1) Business Day prior to Closing. Notwithstanding the foregoing and for the avoidance of doubt, it is the intent of the Parties that any annual or other adjustments in CAM or Taxes which occur after the Closing Date pursuant to the terms of the Assumed Contracts subject to the Lease Assignment (retroactively or otherwise) shall be the responsibility of Buyer.

2.04    Termination of Agreement. Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the Transactions abandoned, only as provided in this Section 2.04 upon notice by the terminating Party to the other Party and the Secured Party:

(a)    At any time prior to the Closing Date by the mutual written consent of Seller and Buyer;

(b)    By Buyer upon a material breach of any covenant or agreement of Seller set forth in this Agreement (including a breach of Section 5.05), or if any material representation or warranty of Seller shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 8.01(a) or Section 8.01(b), as the case may be, shall become impossible to fulfill on or before the earlier of the Outside Date or five (5) Business Days after delivery of written notice thereof by Buyer, unless such impossibility shall be due to the failure of Buyer to perform or comply with any of the covenants or agreements herein to be performed or complied with by it prior to the Closing;

(c)    By Seller upon a material breach of any covenant or agreement of Buyer set forth in this Agreement, or if any representation or warranty of Buyer shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 8.02(a) or Section 8.02(b), as the case may be, shall become impossible to fulfill on or before the earlier of the Outside Date or within five (5) Business Days after delivery of written notice thereof by Seller, unless such impossibility shall be due to the failure of Seller to perform or comply with any of the covenants or agreements herein to be performed or complied with by it prior to the Closing;

(d)    Automatically upon the Bankruptcy Court's entry of an order approving an Alternative Transaction; provided, that if in connection with such Alternative Transaction, the Buyer is the Back-Up Bidder, then Buyer shall not be permitted to terminate this Agreement pursuant to this Section 2.04(d) until after the earlier of (A) the closing of such Alternative Transaction or (B) the Outside Date;

10

**Execution Version**

(e)    By Seller or Buyer if the Closing has not occurred on or before June 16, 2014 (as may be extended by written agreement of the Parties, the "Outside Date"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 2.04(e) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(f)    By Buyer, if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, an examiner with enlarged powers under section 1106(b) of the Bankruptcy Code or a trustee is appointed pursuant to the Bankruptcy Code, or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of the Acquired Assets; or

(g)    By Seller or Buyer if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date.

2.05    Effect of Termination.

(a)    No termination of this Agreement pursuant to Section 2.04 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which termination is made. In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Buyer or Seller, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Buyer or Seller except as otherwise provided herein; provided, however, that (i) the obligations of the Parties under the Escrow Agreement and Sections 1.07(b), 2.05, 6.02 and ARTICLES IX and XI of this Agreement shall survive any such termination and shall be enforceable hereunder and (ii) the termination of this Agreement for any cause shall not relieve any Party hereto from any Liability which at the time of termination had already accrued to any other Party hereto or which thereafter may accrue in respect of any act or omission of such Party prior to such termination.

(b)    If the Agreement is terminated automatically, mutually by Buyer or Seller or by Buyer, as applicable, pursuant to paragraphs (a), (b), (d), (e), (f), or (g) of Section 2.04, then the Escrow Agent shall pay the Deposit (together with all interest earned thereon) to Buyer.

(c)    If the Agreement is terminated pursuant to paragraph (c) of Section 2.04, then the Escrow Agent shall pay the Deposit to Seller and Seller shall have all other rights and remedies as provided hereunder or applicable Law against Buyer in connection with such breach.

2.06    Remedies.  (i) Each Party recognizes that if such Party breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone may not be adequate to compensate the non-breaching Party for its injuries, (ii) the non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to seek specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any Action is brought by the non-breaching Party to enforce such covenants, the Party in breach shall waive

11

Execution Version

the defense that there is an adequate remedy at Law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of, or to enjoin the violation of, such covenants, and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

2.07    Survival.    The representations and warranties of any Party made herein, in any other Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or, subject to Section 2.05(a), upon termination of this Agreement pursuant to Section 2.04.    Except with respect to covenants or agreements that are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

3.01    Organization and Corporate Power.    Except as a result of the Chapter 11 Case, Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its formation, with full corporate power and authority to execute and deliver this Agreement and each of the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.    The Foreign Qualification Schedule attached hereto lists all of the jurisdictions in which Seller is required to qualify to do business as a foreign corporation, except where the failure to be so qualified would not have a material adverse effect upon the Business.

3.02    Authorization.    Subject to the entry and effectiveness of the Approval Order, the execution, delivery and performance of this Agreement by Seller, each of the other Transaction Documents to which it is a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and each of the other agreements contemplated hereby to which it is a party.    Assuming this Agreement is a valid and binding obligation of Buyer and subject to the entry and effectiveness of the Approval Order, this Agreement and each of the other Transaction Documents to which it is a party constitute, or will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with its terms and conditions, subject to the effect of bankruptcy, insolvency, reorganization, fraudulent conveyance or other similar laws and to general principles of equity (whether considered in proceedings at law or in equity).

3.03    No Violation.    Except as set forth on the Authorization Schedule attached hereto and subject to the entry and effectiveness of the Approval Order, the execution, delivery and performance of this Agreement by Seller and each of the other Transaction Documents to which it is a party (including the assignment of the Assumed Contracts and Permits to Buyer) and the

12

**Execution Version**

consummation of the Transactions do not conflict with or result in any material breach of any of the provisions of, or constitute a material default, acceleration or loss of rights under, result in a material violation of, result in the creation of any Lien upon any Acquired Asset, Acquired Contract or Permit of Seller or require any material authorization, consent, approval, exemption or other action by or notice to any court or other Governmental Authority or any third party, under the provisions of Seller's certificate of incorporation or bylaws or any material indenture, mortgage, lease, loan agreement, license or other Contract (including any Acquired Contract) or instrument to which Seller is bound, or any Law, statute, rule or regulation or order, judgment or decree to which Seller is subject (except to the extent that any of the foregoing is rendered inapplicable by Order of the Bankruptcy Court).

     3.04    Title to Properties.

     (a)    The real property demised by the leases described on the Leased Real Property Schedule attached hereto constitutes all of the real property leased by Seller and used in the Business. The Acquired Assets together with the Excluded Assets constitute all of the assets that are necessary and sufficient to conduct the Business substantially in the manner conducted as of the date hereof.

     (b)    The leases described on the Leased Real Property Schedule are in full force and effect, and Seller holds a valid and existing leasehold interest under each of the leases for the term set forth on the Leased Real Property Schedule. Seller has delivered to Buyer complete and accurate copies of each of the leases described on the Leased Real Property Schedule, and none of the leases have been modified in any material respect, except to the extent that such modifications are disclosed by the copies delivered to Buyer. Seller is not in default or breach in any material respect under any of such leases nor, to the Seller's knowledge, is any other party in default or breach in any material respect under any of such leases.

     (c)    Seller does not own any real property.

     (d)    Seller owns good and marketable title to all of the Acquired Assets, free and clear of all Liens, other than the Permitted Liens and Liens set forth on the attached Liens Schedule.

     3.05    Tax Matters. Except as set forth on the Taxes Schedule attached hereto, Seller has filed (taking into account any valid extensions of time to file) all material Tax Returns which are required to be filed by it and has paid all material taxes shown as due and payable by Seller on all such Tax Returns. All material Taxes which Seller is obligated to withhold from amounts owing to any employee, creditor or third party have been fully paid or properly accrued. There are no ongoing actions, suits, claims, investigations or other legal proceedings with respect to material Taxes against Seller.

     3.06    Contracts and Commitments.

     (a)    Except as set forth on the Contracts Schedule attached hereto, Seller is not a party to any (each a "**Material Contract**"): (i) collective bargaining Contract with any labor union affecting any Transferred Employee; (ii) Contract for the employment, severance or other

13

**Execution Version**

payments or benefits with respect to any Transferred Employee; (iii) agreement or indenture placing a Lien on any portion of the Acquired Assets; (iv) Contract under which it is lessee, licensor, licensee or lessor of, or holds or operates any personal property owned by any other party used in the operation of the Business, for which the annual payment exceeds $25,000; (v) Contract or group of related Contracts with the same party related to the operation of the Business for the purchase or license of products or services, under which the undelivered balance of such products and services has an associated payment in excess of $25,000; (vi) Contract or group of related Contracts with the same party related to the operation of the Business for the sale or license of products or services (excluding Intellectual Property which is covered by clause '(vii)' hereby) under which the payments for such products or services are in excess of $25,000; (vii) license of any Intellectual Property material to the Conduct of the Business (excluding any commercially available off-the-shelf software for which annual payments are less than or equal to $25,000) (collectively, the "Licensed Intellectual Property"); (viii) any Contract with any Material Supplier or Material Customer or (ix) Contract which prohibits Seller from freely engaging in the Business anywhere in the world or requiring it to exclusively purchase, sale, license or provide services to or from any Person.

(b)    (i) Seller has performed any obligations required to be performed by it to date and is not (with or without the lapse of time or the giving of notice, or both) in material breach or default under any Material Contract, and (ii) to Seller's knowledge, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, except only for those defaults that will be cured by Seller in accordance with the Approval Order.

(c)    Buyer either has been supplied with, or has been given access to, a true and correct copy of all Contracts which are referred to on the Contracts Schedule, together with all material amendments, waivers or other changes thereto (provided, however, that Seller shall not be required to reveal to Buyer prior to Closing the co-parties to any of the non-disclosure agreements that were entered into in connection with the sale process (provided that such non-disclosure agreement shall be in substantially the form provided to Buyer)).

(d)    Seller has fully funded, or prior to Closing , will fully fund, all premiums or other amounts owed in respect of the Assumed Plans for periods ending on or prior to Closing, , provided, however, for the avoidance of doubt and for the purposes of this section 3.06(d) only, Assumed Plans does not include accrued paid time off for Seller employees, and the match for Seller's 401(k) for the then current pay period.

3.07    Intellectual Property.

(a)    Section 3.07(a) of the Intellectual Property Schedule attached hereto contains a true, correct and complete list of all Seller Registered Intellectual Property that includes the jurisdictions in which such item of Seller Registered Intellectual Property has been registered or filed and the applicable registration or serial number.    All Seller Registered Intellectual Property is valid and subsisting, and, to the actual knowledge of the individuals identified in Section 10.02 below, enforceable.

14

**Execution Version**

(b)     Except for Licensed Intellectual Property, as set forth on <u>Section 3.07(b)</u> of the <u>Intellectual Property Schedule</u> attached hereto (which schedule also accurately identifies each applicable Contract pursuant to which such Intellectual Property is licensed to the Seller), the Seller Owned Intellectual Property constitutes all of the material Intellectual Property used in connection with or necessary for the operation and conduct of the Business as it is currently operated by Seller.  Seller exclusively owns and possesses all right, title, and interest in and to the Seller Owned Intellectual Property, free and clear of any Liens, other than the Permitted Liens and Liens set forth on the attached <u>Liens Schedule</u>.

(c)     ·<u>Section 3.07(c)</u> of the <u>Intellectual Property Schedule</u> attached hereto accurately identifies each Contract pursuant to which any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable) or interest in, any material Seller Owned Intellectual Property.  The Seller has not assigned or otherwise transferred ownership of, or agreed to assign or otherwise transfer ownership of, any material Seller Owned Intellectual Property to any Person.

(d)     Except as set forth on <u>Schedule 3.07(d)</u> of the Intellectual Property Schedule, the Seller Owned Intellectual Property was developed by employees, agents, consultants, contractors or other Persons who have executed appropriate, valid, enforceable and irrevocable instruments of assignment in favor of the Seller as assignee that have conveyed to the Seller ownership of all Intellectual Property rights in such Intellectual Property.

(e)     Except as set forth on <u>Section 3.07(e)</u> of the <u>Intellectual Property Schedule</u>, Seller has not received any written notices of infringement or misappropriation from any third party with respect to the Seller Owned Intellectual Property.  To the Seller's Knowledge, neither the Seller nor any of its products or services has infringed (directly, contributorily, by inducement or otherwise), misappropriated or otherwise violated, nor is currently infringing (directly, contributorily, by inducement or otherwise), misappropriating or otherwise violating the Intellectual Property of any other Person and, except as set forth on <u>Section 3.07(e)</u> of the <u>Intellectual Property Schedule</u>, to Seller's knowledge, no third party has or is currently infringing upon, misappropriating or otherwise violating any Seller Owned Intellectual Property.  No claim, legal proceeding or Action involving any Seller Owned Intellectual Property is pending against Seller or, to the Seller's Knowledge, has been threatened against Seller.

(f)     Other than in connection with the Chapter 11 Case or as set forth on <u>Section 3.07(f)</u> of the <u>Intellectual Property Schedule</u>, the Seller is not subject to any proceeding or Order (i) restricting in any manner the use, transfer or licensing by the Seller of any of the Seller Intellectual Property or (ii) that may affect the validity, use or enforceability of the Seller Intellectual Property or any product or service of the Seller related thereto.

(g)     Except as set forth on <u>Section 3.07(g)</u> of the <u>Intellectual Property Schedule</u>, to Seller's Knowledge, none of the Software owned by the Seller contains any bug, defect or error (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission or use of date data) that materially and adversely affects the use, functionality or performance or any product or material system containing or used in conjunction with such Software as currently used by Seller.

15

**Execution Version**

(h)     To Seller's Knowledge, no Software owned by the Seller contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or that is capable of performing, any of the following functions:  (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (ii) damaging or destroying any data or file without the user's consent.

(i)  ·   Except as set forth on <u>Section 3.07(i)</u> of the <u>Intellectual Property Schedule</u>, no Software owned by the Seller is subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License, Lesser GNU Public License or Mozilla Public License) that requires, as a condition to the use or distribution of such Software of the Seller on, the disclosure, licensing or distribution of any source code for any portion of such Software of the Seller, or could or does otherwise impose any limitation, restriction or condition on the right or ability of the Seller to use or distribute any Software of the Seller.

(j)     The Seller has taken reasonable steps to maintain the confidentiality of and otherwise protect its rights in the Seller Confidential Information and any trade secret or confidential information of third parties used by the Seller, and, except under confidentiality obligations, there has not been any disclosure by the Seller of any Seller Confidential Information or any such trade secret or confidential information of third parties. Except as set forth on <u>Section 3.07(j)</u> of the <u>Intellectual Property Schedule</u>, none of the Software source code owned by the Seller has been delivered, licensed, published or disclosed by the Seller, and no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time or both) will, or could reasonably be expected to, result in the delivery, license or disclosure of such source code to any other Person.

3.08    <u>Litigation; Compliance; Permits</u>.  Except as set forth on the <u>Litigation Schedule</u> attached hereto, there are no Actions pending or, to Seller's knowledge, overtly threatened against Seller, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.  There are no outstanding Orders, judgments, injunctions or decrees of any court or Governmental Authority against Seller or, to Seller's knowledge, relating to any Action that apply, in whole or in part, to Seller.  Set forth on the <u>Permits Schedule</u> is a complete and accurate list of all material Permits.  Each Permit is valid and in full force and effect, and is not subject to any pending or threatened administrative or judicial Action to revoke, cancel, suspend or declare such Permit invalid in any respect.

3.09    <u>Brokerage</u>.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Seller (other than the fees and expenses of JMP Securities LLC, which shall be paid by Seller).

3.10    <u>Governmental Consent, etc</u>.  Except as set forth on the <u>Governmental Consents Schedule</u> and subject to the entry and effectiveness of the Approval Order, no material Permit, consent, approval or authorization of, or declaration to or filing with, any Governmental

16

Execution Version

Authority is required in connection with any of the execution, delivery or performance of this Agreement by Seller or the consummation by Seller of any other transaction contemplated hereby.

3.11    Insurance.  The Insurance Schedule attached hereto lists each insurance policy maintained by Seller.  All of such insurance policies are in full force and effect, and to Seller's knowledge, Seller is not in material default with respect to its obligations under any of such insurance policies.  Also set forth on the Insurance Schedule is a list of all pending claims relating to the Business submitted by or on behalf of Seller under any insurance policies listed on the Insurance Schedule.

3.12    Affiliated Transactions.   Except as set forth on the Affiliated Transactions Schedule attached hereto, no officer, director, shareholder or Affiliate of the Seller or any individual in such officer's, director's or shareholder's immediate family is a party to any material Contract or transaction with Seller as related to the Business or has any material interest in any material property used by the Business.  Holding is the holder of all the issued and outstanding capital stock of Edgenet.

3.13    Financial Statements.  The Financial Statements Schedule sets forth a list of the financial statements provided by Seller to Buyer with respect to the Business (collectively the "Seller Reports").  Except as set forth on the Financial Statements Schedule, each of the Seller Reports have been prepared in accordance with generally accepted accounting principles applied on a consistent basis, presents fairly, in all material respects, the financial position and results of operations and cash flows of Seller as of the respective dates or for the respective periods set forth therein and have been prepared on a consistent basis.  Not later than two (2) Business Day's prior to Closing, Seller shall provide Buyer an updated balance sheet estimated as of the Closing, listing, among other things, the current, post-petition accounts payable and accounts receivable as of the date thereof.

3.14    Customers and Suppliers.  The Customers and Suppliers Schedule sets forth a list of the names of the ten largest customers (the "Material Customers") and ten largest suppliers ("Material Suppliers") of the Business (as measured by billings and expenditures, respectively) for the cumulative 12 month period ended December 31, 2013 and the 2 month period ended February 28, 2014.  Except as set forth on the Customers and Suppliers Schedule, none of the Material Customers or Material Suppliers during the 12 month period ended on the date hereof has cancelled, terminated, materially reduced or indicated its intention to cancel, terminate or materially reduce the amount of business transacted with Seller.

3.15    Absence of Developments.  Except as set forth on Developments Schedule or in connection with the Chapter 11 Case, since December 31, 2013, Seller has not: (i) sold, assigned, transferred, leased, licensed or otherwise encumbered any of its material assets, except in the ordinary course of business consistent with past practice, or canceled any debts or claims; (ii) made or granted any material bonus or any material wage or salary increase to any employee or group of employees (except in the ordinary course of business consistent with past practice or Orders approved in the Chapter 11 Case), or made or granted any material increase in any Plan or arrangement, or amended or terminated any existing Plan or arrangement or adopted any new Plan or arrangement or entered into, amended or terminated any collective bargaining agreement

17

**Execution Version**

or other employment Contract; (iii) suffered any extraordinary losses or waived any rights of value (whether or not in the ordinary course of business or consistent with past practice) in excess of $50,000 in the aggregate; (iv) made capital expenditures or commitments therefor that amount in the aggregate to more than $50,000; (v) except as to unpaid, pre-petition claims, delayed or postponed the payment of any accounts payable or commissions or any other liability or obligation, or agreed or negotiated with any party to extend the payment date of any accounts payable or commissions or any other material liability or obligation or accelerated the collection of (or discounted) any accounts or notes receivable outside the ordinary course of business; (vi) taken any action or failed to take any action that has, had or would reasonably be expected to have the effect of materially accelerating to pre-Closing period sales to customers or other revenues that would otherwise be expected to take place or be incurred after the Closing; or (vii) agreed, whether orally or in writing, to do any of the foregoing.

3.16    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this Article III (as modified by the Schedules hereto), neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, the Business, the Acquired Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective Representatives.  Except for the representations and warranties contained in this Article III (as modified by the Schedules hereto), Seller expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or express warranty of merchantability or fitness for a particular purpose).  Seller makes no representations or warranties to Buyer regarding the probable success or profitability of the Business and Buyer expressly assumes such risk.

3.17    Conduct of Business. Since April 11, 2014, Seller has not undertaken any action or allowed any circumstances or events to occur that, if taken after the date of this Agreement, would constitute a breach of Section 6.05.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

4.01    Organization and Corporate Power.    Buyer is a Tennessee limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full corporate power and authority to enter into this Agreement and each of the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.

4.02    Authorization. The execution, delivery and performance of this Agreement by Buyer and each of the other Transaction Documents to which it is a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and each of the other Transaction Documents to which it is a party. Assuming that this Agreement is a valid and binding obligation of Seller, this Agreement

18

**Execution Version**

and each of the other Transaction Documents to which it is a party constitutes, or will constitute, a valid and binding obligation of Buyer, enforceable in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, fraudulent conveyance or other similar laws and to general principles of equity (whether considered in proceedings at law or in equity).

4.03    No Violation.    Buyer is not subject to or obligated under its certificate of incorporation, any applicable Law, or rule or regulation of any Governmental Authority, or any material agreement or instrument, or any license, franchise or permit, or subject to any order, writ, injunction or decree, which would be breached or violated by Buyer's execution, delivery or performance of this Agreement.

4.04    Governmental Authorities; Consents.    Subject to the entry and effectiveness of the Approval Order, Buyer is not required to submit any notice, report or other filing with any Governmental Authority in connection with the execution or delivery by it of this Agreement or the consummation of the Transactions, including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules and regulations promulgated thereunder. No consent, approval or authorization of any Governmental Authority or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement or the Transactions.

4.05    Litigation.    There are no Actions pending or, to the Buyer's knowledge, overtly threatened against or affecting Buyer at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would adversely affect Buyer's performance under this Agreement or the consummation of the Transactions.

4.06    Brokerage.    There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Buyer.

4.07    Solvency.    Immediately after giving effect to the Transactions, Buyer shall have adequate capital to carry on its business (including the Business). No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of the Business.

4.08    Adequate Assurance.    Buyer is capable of and shall be responsible for satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and is capable of and shall be responsible for producing or providing any and all information required by the Bankruptcy Code and the Bankruptcy Court in connection therewith.

4.09    Financial Capability.    Buyer will have at the Closing (a) sufficient funds available to pay the Purchase Price and any expenses incurred by Buyer in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

19

**Execution Version**

4.10    OFAC. Buyer is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any federal executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order")) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control ("OFAC"), and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation. Buyer is in compliance with all Laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America applicable to Buyer and all beneficial owners of Buyer with respect to or arising out of the requirements of the Executive Order and other similar requirements contained in the rules and regulations of OFAC and in enabling legislation or other federal executive orders in respect thereof.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.01    [Intentionally deleted].

5.02    [Intentionally deleted].

5.03    [Intentionally deleted.]

5.04    Efforts of Seller. Subject to the first sentence of Section 7.08 below, Seller shall not take any action, directly or indirectly, that is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Procedures Order or this Agreement. Seller shall not take any action, directly or indirectly, that is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Approval Order or this Agreement.

5.05    Timing. Seller shall use commercially reasonable efforts to: (a) ensure that the Auction (to the extent not cancelled because there were no competing bids for the Auction) shall be completed no later than June 9, 2014; (b) obtain entry of the Approval Order by no later than June 12, 2014; and (c) consummate the Closing on or before the Closing Date.

5.06    Review of Pleadings. Seller shall deliver or cause to be delivered to Buyer for review and comment, as soon as reasonably practicable, but in no event less than two (2) Business Days, prior to filing, drafts of all substantive documents to be filed on behalf of Seller with the Bankruptcy Court, including all motions, applications, petitions, schedules and supporting papers prepared by Seller (including forms of Orders and notices to interested parties) that relate to the Transactions, which must be reasonably satisfactory in form and substance to Buyer; provided, however, that if Seller is seeking emergency relief, it must deliver or cause to be delivered to Buyer such motions, applications, petitions, schedules, and supporting papers as soon as reasonably practicable under the circumstances.

20

**Execution Version**

5.07    Avoidance Actions.  Seller covenants and agrees that it will not commence or prosecute any Avoidance Actions against any current customer or supplier of the Business as of the Closing Date without the prior consent of Buyer prior to or after the Closing; provided, however, that the prior consent of Buyer shall not be required with respect to the Avoidance Actions described on Schedule 5.07 attached hereto.

## ARTICLE VI
### PRE-CLOSING COVENANTS

6.01    Access to Information.  Seller agrees that prior to the Closing Date, Buyer shall be entitled, through its Representatives, to (a) make such investigation of the properties, businesses and operations of the Business, (b) make such examination of the books and records of the Business, the Acquired Assets and the Assumed Liabilities as Buyer reasonably requests and to make extracts and copies of such books and records, and (c) reasonable access to Seller's employees, customers and vendors.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Seller shall reasonably cooperate therein.  Buyer and its Representatives shall cooperate with Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller is bound.

6.02    Confidential Information.  Buyer acknowledges that Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 6.01, and is subject to the terms of that certain letter agreement dated as of September 28, 2013, by and between Buyer and Seller (as amended, restated, supplemented or otherwise modified from time to time, the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Buyer acknowledges and understands that this Agreement (with the Schedules redacted) shall be an exhibit to the Approval Order, may be otherwise made available by Seller to prospective bidders, and such disclosure shall not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  The provisions of this Section 6.02 and the Confidentiality Agreement shall survive the Closing.  The Parties acknowledge and agree that any disclosures made to the Secured Party by either Party with respect to the Business, the Transactions or the Transaction Documents shall not be in violation of this Section 6.02.

6.03    Employees.  Set forth on the Employee Schedule attached hereto is a list of all of the employees of Seller (which Employee Schedule shall be updated by Seller immediately prior to Closing).  The Seller employees listed on the Employee Schedule are referred to herein as the "Seller Employees".  Buyer may offer employment to any or all of the Seller Employees.  Seller Employees who accept employment offers from Buyer and commence work with Buyer pursuant to such offers shall be referred to herein as "Transferred Employees".  All Transferred Employees will be employed by Buyer on an "at-will" basis.  Further, within three (3) Business Days after delivery of written demand therefor delivered by Seller to Buyer at any time within

21

**Execution Version**

sixty (60) days after Closing, Buyer will reimburse Seller in cash up to $150,000 in the aggregate for any severance payments that Seller is required to make to the Seller Employees that are not hired by Buyer.

6.04    Supplements to Schedules.    Seller shall give prompt notice to Buyer of (a) the occurrence or nonoccurrence of any event the occurrence or nonoccurrence of which would be likely to cause a material breach of any representation or warranty made by Seller contained in this Agreement, and (b) any failure of Seller to comply in any material respect with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder.

6.05    Conduct of Business.    Except (a) as required by applicable Law; (b) as otherwise expressly contemplated by this Agreement (including, without limitation, as set forth on the Conduct of Business Schedule (Schedule 6.05) attached hereto), or the Cash Collateral Order; or (c) with the prior written consent of Buyer, during the period from the date of this Agreement to the Closing, Seller shall (i) continue to conduct the Business in the ordinary course of business in all material respects (subject to the restrictions imposed upon Seller as a Debtor in the Chapter 11 Case, including, without limitation, restrictions pursuant to the Cash Collateral Order); (ii) use its commercially reasonable efforts to preserve the present business operations, organization and goodwill of the Business in all material respects; (iii) not merge or consolidate with any other Person or restructure, reorganize or completely or partially liquidate; (iv) not sell, lease, license, transfer, exchange or swap, divest, cancel, abandon, mortgage or otherwise encumber or subject to any Lien (other than Permitted Liens) or otherwise dispose of any material assets; (v) not enter into, materially amend, materially modify or terminate any Material Contract; (vi) not make any material change in the compensation of, or benefits to, its employees, other than changes made in accordance with normal compensation practices and consistent with past compensation practices; (vii) not authorize or commit to make any capital expenditures, including capitalized labor or salary, in excess of $50,000 in the aggregate, unless paid for by Seller in full prior to Closing; (viii) other than in the ordinary course of business consistent with past practice, not waive any rights of material value or suffer any material extraordinary losses or material adverse changes in collection loss experience, or settle any material litigation with respect to the Business; (ix) not take or omit to take any action that has or would reasonably be expected to have the effect of materially accelerating sales to customers or revenues to pre-Closing periods that would otherwise be expected to take place or be incurred in post-Closing periods; (x) not delay or postpone the payment of any accounts payable; (xi) not accelerate the collection of or discount any accounts receivable outside the ordinary course of business; and (xii) not enter into any Contract with respect to any of the foregoing.

ARTICLE VII
OTHER COVENANTS

7.01    Participation and Service Credit.    For at least twelve (12) months following the Closing, Buyer shall offer each Transferred Employee with compensation and benefits (excluding any severance benefits) that are, in the aggregate, substantially comparable to the compensation and benefits provided to such Transferred Employee by Seller or any of its Affiliates immediately prior to the Closing. Effective as of the Closing, Buyer shall give each Transferred Employee service credit for purposes of eligibility, vesting and determination of

22

level of benefits under each Plan of Buyer ("Applicable Buyer Plan") to the extent such service was recognized under a corresponding Plan of Seller. Any Applicable Buyer Plan providing health benefits shall provide that each Transferred Employee shall be immediately eligible to participate in and receive coverage under such Applicable Buyer Plan as of the Closing, and Buyer shall waive any restrictions on coverage for pre-existing conditions or requirements for evidence of insurability under any Applicable Buyer Plan that is a Welfare Benefit Plan for Transferred Employees to the extent such restrictions have been or would have been satisfied under Seller's Welfare Benefit Plans.

7.02    Preservation of Records; Cooperation. Seller and Buyer shall preserve and keep in their possession all records held by them on and after the date hereof relating to the Acquired Assets for a period of three (3) years or such longer period as may be required by applicable Law (provided, however, that in no event shall Seller be required to preserve such records after the Chapter 11 Case is closed or dismissed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Actions involving the Acquired Assets, or any governmental investigations of Seller or Buyer or any of their respective Affiliates related to the Acquired Assets, or in order to enable Seller or Buyer or any of their respective Affiliates to comply with their respective obligations hereunder and each other agreement, document or instrument contemplated hereby or thereby or otherwise, or to allow Seller to transition and conduct accounting and tax wind down activities and prosecute or defend any Actions by making Buyer's computer systems and accounting department personnel reasonably available to Seller without cost (it being acknowledged that Buyer shall maintain the Microsoft Dynamics SL (a/k/a Solomon) System for at least two (2) years after Closing); provided, further, that in no event shall either Party be obligated to provide any information the disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or that would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound. Buyer further acknowledges that Seller shall be entitled to copy any such records, at Seller's sole cost and expense, and to retain copies of such records.

7.03    Certain Taxes.

(a)    Seller and Buyer shall split and equally pay on or prior to their due date all documentary, sales, use, stamp, registration, excise, value added, business, goods and services, transfer, recording, conveyancing and other such Taxes and fees (collectively, "Transfer Taxes"), including any penalties, interests and additions to Tax with respect thereto, incurred in connection with this Agreement, and Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and if required by applicable Law, Buyer shall, and shall cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)    Buyer and Seller shall (and shall cause their respective Affiliates to) cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing or preparation of any Tax Returns and any audit, litigation or other proceeding with respect to Taxes at the cost and expense of the requesting Party. Such cooperation shall include the retention and (upon the other Party's request) the providing of records and information which

23

Execution Version

are reasonably relevant to any such Tax Return audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Buyer shall retain all books and records with respect to Tax matters pertinent to the Acquired Assets and Assumed Liabilities relating to any tax periods for the required statutory period and shall abide by all record retention agreements entered into with any taxing authority, and shall give Seller reasonable written notice prior to transferring, destroying or discarding any such books and records prior to the expiration of the applicable statute of limitations for that tax period, and, if Seller so requests, Buyer shall allow Seller to take possession of such books and records.

(c)     Taxes (other than the Transfer Taxes) imposed upon or assessed directly against the Acquired Assets for a Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Seller and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Seller shall bear the remaining portion of such Taxes.

(d)     Pursuant to Rev. Proc. 2004-53, Buyer and Seller agree to follow the "Standard Procedure" for purposes of satisfying the federal wage and employment tax reporting and filing requirements with respect to wages and other compensation paid to the Transferred Employees for the calendar year which includes the Closing Date. However, Buyer shall be responsible for printing and furnishing a Form W-2 to each Transferred Employee disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom for both Buyer and Seller, and Seller shall be relieved of the responsibility to do so.

7.04    Further Assurances. From time to time prior to, on and following the Closing, as and when requested by any Party hereto and at such Party's expense, any other Party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including the giving or obtaining of any notices or consents). If Buyer is entitled to receive under this Agreement any payments, assets or any accounts receivable and such payments, assets or accounts receivable are paid to, or held by, Seller, then Seller shall promptly, and in any event within five (5) Business Days, remit such amount or asset to Buyer. If Seller is entitled to receive under this Agreement any payments, assets or any accounts receivable and such payments, assets or accounts receivable are paid to, or held by, Buyer, then Buyer shall promptly, and in any event within five (5) Business Days, remit such amount or asset to Seller.

7.05    Name Change. Promptly after the Closing and in any event within thirty (30) days after the Closing Date, Seller shall file (and shall cause its Affiliates to file) with the Secretary of State for the State of Delaware (and any other jurisdictions where it is qualified) an amendment to its certificate of incorporation changing its company name to one dissimilar to, and not including, "Edgenet," and promptly thereafter deliver to Buyer evidence, in form and substance reasonably satisfactory to Buyer, of such change to its company name. From and after

24

the Closing Date, Seller shall cease all use of all Intellectual Property included in the Acquired Assets, including, without limitation, the trademarks included in the Acquired Assets or any confusingly similar variation thereof.

7.06    Seller Confidentiality.  After the Closing, Seller agrees not to disclose or use at any time (and such Person shall cause its Affiliates not to use or disclose at any time) any Seller Confidential Information. After the Closing, Seller further agrees to take all appropriate steps (and to cause its Affiliates to take all appropriate steps) to safeguard such Seller Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. In the event Seller or any of its Affiliates is required by Law or legal process to disclose any Seller Confidential Information after the Closing, Seller shall promptly notify Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and such Seller shall cooperate with Buyer to preserve the confidentiality of such information consistent with applicable Law.

7.07    Non-Assignment of Contracts.    Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Contract if, after giving effect to the provisions of section 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a consent, would constitute a breach thereof or in any way negatively affect the rights of Buyer, as the assignee of such Assumed Contract. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, such consent is required but not obtained, prior to the closing or conversion of the Chapter 11 Case, Seller shall cooperate with Buyer, at Buyer's sole expense, in any reasonable arrangement, including Buyer's provision of credit support, designed to provide for Buyer the benefits and obligations of or under any such Assumed Contract, including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation thereof by such third party (provided that Buyer shall fully indemnify and hold Seller harmless with respect to any and all claims, costs and expenses relating to or arising from such Contract from and after the Closing Date). Any assignment to Buyer of any Assumed Contract that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained. Any Contract that would be an Assumed Contract but is not assigned in accordance with the terms of this Section 7.07 shall not be considered an "Assumed Contract" for purposes hereof unless and until such Contract is assigned to Buyer after the Closing Date upon receipt of the requisite consents to assignment and Bankruptcy Court approval, if required.

ARTICLE VIII
CONDITIONS TO CLOSING

8.01    Conditions Precedent to Obligations of Buyer.    The obligation of Buyer to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects at and as of the Closing, except to the extent such

25

representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date), (in each case except for such representations and warranties that are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects giving effect to such qualifications) and Buyer shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(c)     Since the date of this Agreement, no fact, event or circumstance shall have occurred or arisen that, individually or in combination with any other fact, event or circumstance, has had or would reasonably be expected to have a Material Adverse Effect;

(d)     Seller shall have received or obtained and delivered to Buyer all consents set forth on Schedule 8.01(d) and such consents shall be in full force and effect;

(e)     **[Reserved]**; and

(f)     Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 2.02(a).

8.02     Conditions Precedent to Obligations of Seller.    The obligation of Seller to consummate the Transactions is subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date), (in each case except for such representations and warranties that are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects giving effect to such qualifications) and Seller shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(b)     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect; and

(c)     Buyer shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.02(b).

26

Execution Version

8.03    Conditions Precedent to Obligations of Buyer and Seller. The respective obligations of Buyer and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Procedures Order shall have been entered by the Bankruptcy Court, shall not have been and at the time stayed, vacated, revoked, or withdrawn as of the Closing Date (it being acknowledged and agreed that the Buyer shall waive any right it may have under the applicable sections of the Bankruptcy Code or Rules that require the expiration of fourteen (14) days after the entry of such Order before consummating the transactions contemplated hereby); and

(c)    the Approval Order shall have been entered by the Bankruptcy Court, shall not have been stayed, vacated, revoked, or withdrawn as of the Closing Date (it being acknowledged and agreed that the Buyer shall waive any right it may have under the applicable sections of the Bankruptcy Code or Rules that require the expiration of fourteen (14) days after the entry of such Order before consummating the transactions contemplated hereby).

8.04    Frustration of Closing Conditions. Neither Seller nor Buyer may rely on the failure of any condition set forth in Section 8.01, Section 8.02 or Section 8.03, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

ARTICLE IX
LIMITATIONS

9.01    Buyer's Review.

(a)    No Reliance. Buyer has had the opportunity to ask questions in connection with its decision to enter into this Agreement and to consummate the Transactions. In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Buyer has not relied upon, and Buyer expressly waives and releases Seller from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Seller or its Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in Article III. In deciding to enter into this Agreement, and to consummate the Transactions, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Seller or its Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article III. Buyer acknowledges and agrees that it has not relied upon, and Buyer expressly waives and releases Secured Party from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of

27

any type provided by Secured Party or its Affiliates (excluding Seller to the extent deemed an Affiliate of Secured Party).

(b)    Limited Duties.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Acquired Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

9.02    No Consequential or Punitive Damages.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

ARTICLE X
DEFINITIONS

10.01    Definitions.  The following terms have the meaning set forth below:

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Acquired Assets" has the meaning set forth in Section 1.01.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means (i) the acquisition of any shares of capital stock or any other voting securities of Seller or any interests therein, (ii) the acquisition of all or more than an immaterial portion of the assets and properties of Seller or any interests therein in one or a series of transactions, (iii) the merger, consolidation or combination of any Person with Seller, (iv) the reorganization or liquidation of Seller through a chapter 11 plan, or (v) any of the foregoing transactions effected through a credit bid of or regarding any creditor's Claims against Seller, whether pursuant to section 363(k) of the Bankruptcy Code or otherwise, in each case other than Buyer.

"Applicable Buyer Plan" has the meaning set forth in Section 7.01.

28

Execution Version

"Approval Order" means an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit H (with such non-material revisions thereto as may be required by the Bankruptcy Court), and which has not been modified in any respect for terms without the prior consent of Buyer that (a) affect in any respect the economics of the Transaction or the dates or deadlines set forth in the order or the Agreement (other than dates or deadlines modified to accommodate the Bankruptcy Court's schedule) or (b) is materially adverse to Buyer in any other respect.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.02(a).

"Assumed Contract" has the meaning set forth in Section 1.01(e).

"Assumed Liabilities" has the meaning set forth in Section 1.03.

"Auction" has the meaning specified in the Procedures Order.

"Back-Up Bidder" has the meaning given to such term in the Procedures Order.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Deadline" has the meaning given to such term in the Procedures Order.

"Bill of Sale" has the meaning set forth in Section 2.02(a).

"Business" has the meaning set forth in the preamble.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware.

"Business Records" means all books, files and records to the extent they apply to the Acquired Assets, including customer lists, historical customer files, reports, plans, data, accounting and tax records, test results, product specifications, drawings, diagrams, training manuals, engineering data and safety and documents, maintenance schedules, operating and production records, inventory records, business plans, and marketing and all other studies, documents and records.

"Buyer" has the meaning set forth in the preamble.

"Cash Collateral Order" means that certain final Order (a) Authorizing Postpetition Use of Cash collateral, (B) Granting Adequate Protection to the Adequate Protection Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief entered by the Bankruptcy Court in the Chapter 11 Case on or about February 19, 2014 at docket number.

"Chapter 11 Case" has the meaning set forth in the recitals.

**Execution Version**

"Claiming Party" has the meaning set forth in Section 11.17.

"Claims" means any and all claims as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.01.

"Closing Date" has the meaning set forth in Section 2.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 6.02.

"Contract" means any contract, purchase order, indenture, note, bond, loan, instrument, certificate, deed, bill of sale, license, lease, commitment, understanding (written or oral) or other agreement.

"Copyright Assignment" has the meaning set forth in Section 2.02(a).

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise cured or given adequate assurance that they will be promptly cured in order to satisfy Seller's monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer in accordance with this Agreement as such amounts are determined by the Bankruptcy Court to satisfy section 365 of the Bankruptcy Code.

"Defending Party" has the meaning set forth in Section 11.17.

"Deposit" has the meaning set forth in Section 1.07(a).

"Domain Name Assignment" has the meaning set forth in Section 2.02(a).

"Escrow Agent" has the meaning set forth in Section 1.07(a).

"Escrow Agreement" has the meaning set forth in Section 1.07(a).

"Excluded Assets" has the meaning set forth in Section 1.02.

"Excluded Contracts" has the meaning set forth in Section 1.04(b).

"Excluded Liabilities" has the meaning set forth in Section 1.05.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the United States or to a foreign, federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

PHIL1 3667984v.3

**Execution Version**

"Indebtedness" means all indebtedness for borrowed money (i) owed by the Seller under a credit facility or (ii) evidenced by any note, bond, debenture or other debt security issued by Seller and also shall include (a) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business, (b) the face amount of all letters of credit issued for the account of Seller, (c) obligations (whether or not such Seller has assumed or become liable for the payment of such obligation) secured by Liens, (d) capitalized lease obligations, (e) overdue trade payable, (f) all guarantees and similar obligations of Seller, (g) all accrued interest, fees and charges in respect of any Indebtedness, and (h) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any Indebtedness.

"Intellectual Property" means any or all of the following and all rights, arising out of or associated therewith: (i) all patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether patentable or not), invention disclosures, improvements, proprietary information, know-how, technology, algorithms, apparatus, databases and data collections, diagrams, formulae, methods, network configurations and architectures, processes, protocols, schematics, specifications, technical data and customer lists, and all documentation relating to any of the foregoing; (iii) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto; (iv) all industrial designs and any registrations and applications therefor; (v) all internet uniform resource locators, domain names, trade names, logos, brand names, slogans, product names, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (vi) all Software, databases, subroutines, user interfaces, techniques, URLs, web sites and data collections and all rights therein; (vii) all moral and economic rights of authors and inventors, however denominated; (viii) other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing such as instruction manuals, laboratory notebooks, prototypes, samples, studies, and summaries); (ix) all rights under non-disclosure or confidentiality, non-compete, assignment of intellectual property rights (inventions), acknowledgement of work-for-hire or non-solicitation agreements with employees, consultants, independent contractors and agents of a Person or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the sale of the Business; and (x) any similar or equivalent rights to any of the foregoing.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, governmental guideline or other requirement enacted, promulgated, issued or entered by a Governmental Authority, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of a Governmental Authority.

"Lease Assignment" has the meaning set forth in Section 2.02(a).

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings,

31

Execution Version

deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Licensed Intellectual Property" has the meaning set forth in Section 3.06(a).

"Lien" means any mortgage, pledge, hypothecation, lien (statutory or otherwise), preference, priority, security interest, security agreement, easement, charge, claim, covenant, restriction, proxy, option, warrant, call, commitment, voting agreement or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and any assignment or deposit arrangement in the nature of a security device).

"Material Adverse Effect" means any change, effect, event, occurrence, development, circumstance or state of facts which (i) has had or would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on the Business or the financial condition or results of operations of the Seller, (ii) would materially impair the ability of Seller to perform its obligations under this Agreement or (iii) would have a materially adverse effect on, or prevent or materially delay the consummation of, the Transactions; provided, however, that a Material Adverse Effect shall not include (A) general economic or industry circumstances or events, but only if such circumstances or events do not have a disproportionate impact on the Business when compared to other industry participants, and (B) changes, effects, or impacts on Seller or the Business arising directly out of, based on, or resulting from (x) the taking of any actions required to be taken by a Party under the terms of this Agreement, (y) the filing by Seller of the Bankruptcy Case, or (z) the sale process in the Chapter 11 Case.

"Material Contract" has the meaning set forth in Section 3.06.

"Material Customers" has the meaning set forth in Section 3.14.

"Material Suppliers" has the meaning set forth in Section 3.14.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Outside Date" has the meaning set forth in Section 2.04(e).

"Parties" has the meaning set forth in the preamble.

"PayPal Funds" means all "restricted cash," all "cash reserves," and any other balance of cash in an account held by PayPal for Seller, net an allowance for chargebacks.

32

**Execution Version**

"Permitted Liens" means:

(a)    all rights reserved to or vested in any Governmental Authority to control or regulate the Acquired Assets and all obligations and duties under all applicable Laws or under any Permit issued by any Governmental Authority;

(b)    Liens for Taxes not yet due and payable;

(c)    statutory or contractual Lien rights of landlords arising in the ordinary course under leases subject to the Lease Assignment for the payment of rents or other amounts required thereunder accruing from and after Closing;

(d)    any defects, exceptions, existing easements, covenants, conditions, rights-of-way, restrictions and other encumbrances (other than monetary Liens) and matters currently of record affecting title to the real property which, when taken individually or as a whole, are not material, do not adversely affect the present ownership, use or operations of such properties or assets;

(e)    with respect to leases subject to the Lease Assignment, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any governmental body having jurisdiction over such real property; and

(f)    Liens and encumbrances designated as Permitted Liens on the Liens Schedule.

"Permits" means any approvals, authorizations, consents, licenses, franchises, permits or certificates (and any related pending applications).

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Authority (or any department, agency, or political subdivision thereof).

"Plan" means (i) "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or under any similar Law, and (ii) all other material employee benefit plans, programs and arrangements, including all material profit-sharing, bonus, stock option, restricted stock units/shares, stock ownership, pension, retirement, deferred compensation, excess benefit, post-retirement medical or life insurance, welfare, incentive, sick leave or other leave of absence, short- or long-term disability, retention, salary continuation, medical, hospitalization, life insurance, and other insurance plan, in any case, established, maintained, sponsored or contributed to by Seller for the benefit of any of its current or former employees or service providers, including any Welfare Benefit Plan.

"Procedures Order" means the order of the Bankruptcy Court dated May 5, 2014 approving, among other things, the sales and bidding procedures in connection with the sale of Seller's assets pursuant to Sections 363 and 365 of the Bankruptcy Code.

33

**Execution Version**

"Proration Period" has the meaning set forth in Section 7.03(c).

"Purchase Price" has the meaning set forth in Section 1.06.

"Registered Intellectual Property" means all Intellectual Property rights that are the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded with or by any Governmental Authority, including all (i) patents and patent applications (including provisional applications), (ii) registered trademarks and service marks, applications to register trademarks and service marks, intent-to-use applications, or other registrations or applications related to trademarks and service marks, (iii) registered copyrights and applications for copyright registration, (iv) registered mask works, and (v) domain name registrations.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees and other agents and representatives.

"Secured Party" means Liberty Partners Lenders, L.L.C. or such other entity designated by Liberty Partners Lenders, L.L.C.

"Seller Confidential Information" means confidential and proprietary information (including with respect to the Business Records) concerning Seller, including information relating to financial statements, clients, customers, potential clients or customers, employees, advertisers, publishers, suppliers, equipment, designs, drawings, programs, strategies, analyses, profit margins, sales, methods of operation, plans, products, technologies, materials, trade secrets, strategies, prospects or other proprietary information.

"Seller Employee" has the meaning set forth in Section 6.03.

"Seller Owned Intellectual Property" has the meaning set forth in Section 1.01(d).

"Seller Registered Intellectual Property" means all of the Registered Intellectual Property included among the Seller Owned Intellectual Property.

"Seller Reports" has the meaning set forth in Section 3.13.

"Seller's knowledge" has the meaning set forth in Section 10.02.

"Software" means any computer software program, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human readable form, including all comments and any procedural code.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar

34

ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed with a taxing authority, including any schedule or attachment thereto, and including any amendment thereof.

"Trademark Assignment" has the meaning set forth in Section 2.02(a).

"Transaction Documents" means this Agreement, the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Lease Assignment, the Trademark Assignment, the Copyright Assignment, the Domain Name Assignment and all other Contracts and agreements contemplated by this Agreement or necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transferred Employee" has the meaning set forth in Section 6.03.

"Transfer Taxes" has the meaning set forth in Section 7.03(a).

"Welfare Benefit Plan" means any welfare plan as defined in section 3(1) of the Employee Retirement Income Security Act of 1974, as amended.

10.02  Knowledge Defined.  For purposes of this Agreement, the term "Seller's knowledge" (or words of similar purport) as used herein shall mean the knowledge, after reasonable inquiry (or that which one would have known after reasonable inquiry), of Tom Frederick, Juliet Reising, Adam Redd, Tom Clement and Joe Czarnecky.

## ARTICLE XI
## MISCELLANEOUS

11.01  Press Releases and Communications.  No press release or public announcement related to this Agreement or the Transactions shall be issued or made without the joint approval of Buyer and Seller, unless required by Law (in the reasonable opinion of counsel) in which case

35

Buyer and Seller shall have the right to review such press release or announcement prior to publication; provided that Seller shall be authorized to file this Agreement with the Bankruptcy Court without any further approval by Buyer.

11.02   Expenses.   Except as otherwise expressly provided herein, Seller and Buyer shall pay all of their own expenses (including attorneys' and accountants' fees and expenses) in connection with the negotiation of this Agreement, the performance of their respective obligations hereunder and the consummation of the Transactions (whether consummated or not).

11.03   Notices.   All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, or (ii) when sent to the recipient by facsimile followed by delivery by reputable overnight courier service, or (iii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iv) five Business Days after being mailed to the recipient by first class, registered or certified mail, postage prepaid, return receipt requested.   Such notices, demands and other communications shall be sent to Buyer and Seller at the addresses or facsimile numbers indicated below or to such other address or facsimile numbers or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.   All notices, demands and other communications hereunder may be given by any other means (including electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient:

Notices to Buyer:

EDGEAQ, LLC
30 Burton Hills Boulevard
Nashville, TN 37215
Attn:  Bill Nutter
Facsimile: (615) 371-1572

with copies to (which shall not constitute notice to Buyer):

John E. Murdock, III
Bradley Arent Boult Cummings, LLP
Roundabout Plaza
1699 Division Street, Suite 700
Nashville, TN 37203
Facsimile 615.252.6359

and

Ernest B. Williams, IV, PLLC
PO Box 159264
Nashville, TN 37215
Facsimile: (615) 371-1572

36

**Execution Version**

Notices to Seller:

Edgenet, Inc.
3525 Piedmont Road
8 Piedmont Center, Suite 420
Atlanta, GA 30305
Attn: Juliet Reising, CFO

with copies to (which shall not constitute notice to Seller): .

Liberty Capital Partners, Inc.
750 3rd Avenue, 9th floor
New York, NY 10017
Attn: Michael Fram
Facsimile: (212) 649-6076

and

Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Attn: Morton R. Branzburg, Esq.
Facsimile: (215) 568-6603

11.04 <u>Successors and Assigns</u>.    This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except that neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by Buyer, without the prior written consent of Seller, and neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by Seller without the prior written consent of Buyer; <u>provided that</u> Buyer may assign its rights under this Agreement to (a) any Affiliate of Buyer, (b) any purchaser of all or substantially all of the assets of Buyer or (c) to lender(s) of Buyer as collateral security for borrowing, at any time following the Closing Date; provided further that in each such case, Buyer and Tenth Street Fund III, L.P., as a guarantor will nonetheless remain liable for all of Buyer's obligations hereunder.

11.05 <u>Severability</u>.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable Law or rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

37

**Execution Version**

11.06  Descriptive Headings; Interpretation; Disclosure Generally.

(a)    The headings and captions used in this Agreement and the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.

(b)    If and to the extent any information required to be furnished in any Schedule is contained in this Agreement or in any Schedule attached hereto, such information shall be deemed to be included in all Schedules in which the information is required to be included. The inclusion of any information in any Schedule attached hereto shall not be deemed to be an admission or acknowledgment by Seller, in and of itself, that such information is material to or outside the ordinary course of the business of Seller.

11.07  Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement. Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to one gender include the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation," (d) the terms "this Agreement," "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (e) the terms "day" and "days" mean and refer to calendar day(s) and (f) the terms "year" and "years" mean and refer to calendar year(s).

11.08  Complete Agreement.  This Agreement, the Transaction Documents and the Confidentiality Agreement contain the complete agreement between the Parties hereto with respect to the subject matter hereof and thereof and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way. All Schedules and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

11.09  Counterparts; Delivery by Facsimile or PDF.  This Agreement may be executed in one or more counterparts (including by means of facsimiled signature pages or signature pages delivered by electronic transmission in portable document format (pdf)), each of which shall constitute an original but all of which taken together shall constitute one and the same instrument. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it was the original signed version thereof delivered in person. At the request of any Party hereto or to any such agreement or instrument,

38

**Execution Version**

each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic transmission in portable document format (pdf) to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission in portable document format (pdf) as a defense to the formation of a contract and each such Party forever waives any such defense, except to the extent such defense related to lack of authenticity.

11.10   Governing Law.   All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Agreement (and all Schedules and Exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

11.11   Submission to Jurisdiction

(a)   Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the Transaction Documents and to decide any claims or disputes among the Parties that may arise or result from, or be connected with, the Transaction Documents, any breach or default thereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 11.03; provided, however, that if the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware.

(b)   The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement, any of the other Transaction Documents or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)   Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by the mailing of a copy thereof in accordance with the provisions of Section 11.03; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served; further, provided, however, that nothing herein shall limit or alter service of process in any advisory proceeding in the Bankruptcy Court.

11.12   No Right of Set-Off.   Only with respect to the period prior to and as of the Closing, Buyer for itself and for its Affiliates, successors and assigns hereby unconditionally and

39

Execution Version

irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or any of its Affiliates, successors and assigns has or may have prior to or as of the Closing with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith. Only with respect to the period prior to and as of the Closing, Seller, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Seller or any of its Affiliates, successors and assigns have or may have prior to or as of the Closing with respect to any payments to be made by Seller pursuant to this Agreement or any other document or instrument delivered by Seller in connection herewith.

11.13    WAIVER OF JURY TRIAL.    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES HERETO HEREBY WAIVES AND COVENANTS SUCH PARTY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, ACTION, CLAIM, CAUSE OF ACTION, SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.    EACH PARTY ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY THAT THIS SECTION 11.13 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THE PARTIES ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT AND ANY OTHER AGREEMENTS RELATING HERETO OR CONTEMPLATED HEREBY.    ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.13 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

11.14    Bulk Transfer Laws.    Buyer acknowledges that Seller has not and will not comply with the provisions of any so-called bulk sales or transfer laws of any applicable jurisdiction (including Article 6 of the Uniform Commercial Code) in connection with the sale of Acquired Assets and the other transactions contemplated by this Agreement, and Buyer hereby waives Seller's failure to comply with such laws.

11.15    Amendments and Waivers.    This Agreement may be amended, or any provision of this Agreement may be waived, upon the approval, in writing, executed by Buyer and Seller.  No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party under or by reason of this Agreement.  A waiver by any party of any term or condition of this Agreement in any one instance shall not be deemed or construed to be a waiver of such term or condition for any other instance in the future (whether similar or dissimilar) or of any subsequent breach hereof.

PHIL1 3667984v.3

11.16  No Third Party Beneficiary.  This Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person (including any Transferred Employee) any legal or equitable rights or remedies hereunder, other than the parties hereto and the Secured Party, their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

11.17  Prevailing Party.  In the event any litigation or other court Action is commenced or threatened by any Person (the "Claiming Party") to enforce its rights under this Agreement against any other Person (the "Defending Party"), if the Defending Party is the prevailing party in such Action, all fees, costs and expenses, including reasonable attorney's fees and court costs, incurred by the Defending Party in such Action shall be reimbursed by the Claiming Party; provided that if the Defending Party prevails in part, and loses in part, in such Action, the court, arbitrator or other adjudicator presiding over such Action shall award a reimbursement of the fees, costs and expenses incurred by the Defending Party on an equitable basis.  For purposes hereof, and without limitation, the Defending Party shall be deemed to have prevailed in any Action described in the immediately preceding sentence if the Claiming Party commences or threatens any such Action and (i) such underlying claim(s) are subsequently dropped, voluntarily dismissed or voluntarily reduced and/or (ii) the Defending Party defeats any such claim(s).

11.18  Non-Recourse.  Except as otherwise provided herein, the Parties acknowledge and agree that no past, present or future Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any Liability for any obligations or Liabilities of Buyer or Seller, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

11.19  Guaranty of Buyer Obligations.  Tenth Street Fund III, L.P. ("Guarantor") hereby unconditionally and irrevocably guarantees, as primary obligor and not as surety, the due and punctual payment, observance, performance and discharge by Buyer (and any permitted assignees thereof) of all of its obligations to Seller pursuant to the terms of this Agreement (as such obligations may be modified, amended or terminated in accordance with terms of this Agreement, the "Guaranteed Obligations").  The foregoing sentence is an absolute, unconditional and continuing guaranty of the full and punctual payment, observance, discharge and performance of the Guaranteed Obligations.  Should Buyer default in the discharge or performance of all or any portion of the Guaranteed Obligations, the obligations of Guarantor hereunder shall become immediately due and payable to Seller.  Notwithstanding anything to the contrary set forth herein, all obligations of Guarantor pursuant to this Section 11.19 shall terminate immediately and automatically upon the earliest to occur of (i) the Closing, (ii) any termination of this Agreement other than by Seller pursuant to Section 2.04(c), or (iii) the date that is 30 days after the termination of this Agreement by Seller pursuant to Section 2.04(c), except as to any claim asserted in writing against Guarantor prior to such date (in which case the obligations of Guarantor hereunder shall terminate when such claim is finally resolved or otherwise satisfied).  By its acceptance of the benefits of this Section 11.19, Seller further agrees that it does not have any right of recovery against, and no personal liability shall attach to, any former, current or future, direct or indirect, director, officer, employee, agent or affiliate of Guarantor (other than Buyer), any former, current or future, direct or indirect, holder of any equity interests or securities of Guarantor (whether such holder is a limited or general partner,

41

**Execution Version**

member, stockholder or otherwise), or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, affiliate, controlling person, or representative of any of the foregoing (each such Person, a "Related Person"), through Buyer, Guarantor or otherwise, whether by or through any attempted piercing of the corporate, limited liability company or limited partnership veil, by or through a claim by or on behalf of Buyer against Guarantor or any Related Person, or otherwise, except for the rights against Guarantor as expressly provided in this Section 11.19 or those against Buyer arising under this Agreement or that certain Non-Disclosure Agreement, dated May 22, 2014, by and between JMP Securities LLC, as authorized representative of Edgenet, and Tenth Street Fund III, LLC. Recourse against Guarantor under this Section 11.19 shall be the sole and exclusive remedy of Seller and all of its respective Affiliates against Guarantor or any Related Person (which such defined term in this instance, for the avoidance of doubt, does not include Buyer) in respect of any liabilities or obligations arising under or in connection with this Agreement or the transactions contemplated hereby, including by piercing the corporate, limited liability company or limited partnership veil or by a claim by or on behalf of Buyer. Seller hereby covenants and agrees that it shall not institute, directly or indirectly, and shall cause its Affiliates to not institute, any proceeding or bring any other claim arising under, or in connection with, this Agreement or the transactions contemplated hereby, against Guarantor or any Related Person, except for claims of Seller against Guarantor under this Section 11.19 or against Buyer under this Agreement. Nothing set forth in this Section 11.19 shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) other than Seller any rights or remedies against any Person, including Guarantor, except as expressly set forth in this Section 11.19. In the event that Seller or any Affiliate thereof asserts in any Action any theory of liability against Guarantor or any Related Person (which such defined term in this instance, for the avoidance of doubt, does not include Buyer) with respect to the transactions contemplated by this Agreement other than the Liability of Guarantor under this Section 11.19, then (i) the obligations of Guarantor under this Section 11.19 shall terminate *ab initio* and be null and void, (ii) if Guarantor has previously made any payments under this Section 11.19, it shall be entitled to recover such payments from Seller, and (iii) Guarantor shall not have any liability to Seller or any of its Affiliates with respect to the transactions contemplated by this Agreement. Notwithstanding the foregoing, the total liability of Guarantor under this Agreement shall not exceed the aggregate sum of $7,480,000 plus any Purchase Price increase under Section 1.01(o).

[Signature Page Follows]

42

**Execution Version**

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**EDGENET, INC.**

By: _____
Name: _____
Its: _____


**EDGENET HOLDING CORPORATION**

By: _____
Name: _____
Its: _____


**EDGEAQ, LLC**

BY:    **TENTH STREET FUND III, L.P.,**
       Sole Member

BY:    **TENTH STREET SBIC PARTNERS, LLC,**
       General Partner

By: _____
Name: William J. Nutter
Its:    Authorized Member


**WITH RESPECT ONLY TO <u>SECTION 11.19</u>**

**TENTH STREET FUND III, L.P.**

BY:    **TENTH STREET SBIC PARTNERS, LLC,**
       **General Partner**

By: _____
Name: William J. Nutter
Its:    Authorized Member

Execution Version

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**EDGENET, INC.**

By: _____
Name: _____
Its: _____

**EDGENET HOLDING CORPORATION**

By: _____
Name: _____
Its: _____

**EDGEAQ, LLC**

BY:   **TENTH STREET FUND III, L.P.,**
      Sole Member

BY:   **TENTH STREET SBIC PARTNERS, LLC,**
      General Partner

By: _____
Name: William J. Nutter
Its:   Authorized Member

**WITH RESPECT ONLY TO SECTION 11.19**

**TENTH STREET FUND III, L.P.**

BY:   **TENTH STREET SBIC PARTNERS, LLC,**
      General Partner

By: _____
Name: William J. Nutter
Its:   Authorized Member

June 11, 2014

EDGENET, INC.
EDGENET HOLDING CORPORATION
Attn: Juliet Reising, Chief Financial Officer
3525 Piedmont Road
8 Piedmont Center, Suite 420
Atlanta, GA  30305

EDGEAQ, LLC
Attn: William J. Nutter
30 Burton Hills Boulevard
Nashville, TN  37215

Re:    Assumption of Transferred Employee Paid Time Off

Ladies and Gentlemen:

Reference is hereby made to that certain Asset Purchase Agreement, dated as of June 6, 2014 (the "Asset Purchase Agreement"), by and between Edgenet, Inc., a Delaware corporation, Edgenet Holding Corporation, a Delaware corporation (collectively "Seller"), and EDGEAQ, LLC, a Tennessee limited liability company ("Buyer").

All capitalized terms used but not defined herein shall have the meanings given to them in the Asset Purchase Agreement.

In preparation for the Closing and in an effort to achieve an orderly transfer of the Business, Buyer has agreed to assume at Closing all accrued and unused paid-time-off (excluding, for the avoidance of doubt, any pension or post-retirement liabilities) of any Transferred Employee.

With the foregoing background incorporated hereinafter by reference and hereby made a part hereof, and in consideration of the mutual promises set forth in this letter agreement and such other and further consideration, the receipt and sufficiency of which are hereby acknowledged, this is to confirm that, intending to be legally bound hereby, the parties hereto agree as follows:

1.    Notwithstanding anything to the contrary contained in the Asset Purchase Agreement, this will confirm that, at Closing, Buyer shall assume any accrued and unused paid-time-off (excluding, for the avoidance of doubt, any pension or post-retirement liability) of any Transferred Employees, which such liability shall be deemed to be an Assumed Liability for all purposes of the Asset Purchase Agreement, but limited in the amounts and the employees (to the extent a Transferred Employee) set forth on Exhibit A attached hereto (provided, however, that such amounts as set forth on Exhibit A are as of May 31, 2014 and shall be adjusted at Closing to include any additional PTO time accrued (less any PTO time taken) prior to Closing in the ordinary course of business). It is further understood that each employee, generally, may carry over up to 40 hours of paid time off per year (with the exception of Barbara Catherall, who was permitted to carry over 80 hours with management approval).

PHIL1 3673769v.3

June 11, 2014
Page 2

    2.    This letter agreement cannot be modified except in writing executed by each of the parties hereto.

    3.    This letter agreement may be executed in counterparts, and by electronic signature, each of which shall be deemed to be an original but all of which taken together shall constitute one and the same instrument.

*[Signature page follows]*

PHIL1 3673769v.3

IN WITNESS WHEREOF, the parties have caused this letter agreement to be executed as of the date first set forth above,

EDGENET, INC.

By: _____
Name: Juliet M. Reising
Title: CFO

EDGENET HOLDING CORPORATION

By: _____
Name: Juliet M. Reising
Title: CFO

EDGEAQ, LLC

By:    Tenth Street Fund III, L.P.,
       Sole Member

By:    Tenth Street SBIC Partners, LLC,
       General Partner

By: _____
Name: William J. Nutter
Title:   Authorized Member

PHIL1 3673769v.3